SEYMOUR SACKS and STAR SACKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sacks v. Commissioner
Docket No. 17718-87
United States Tax Court
T.C. Memo 1992-596; 1992 Tax Ct. Memo LEXIS 620; 64 T.C.M. (CCH) 1003; October 6, 1992, Filed *620 Decision will be entered for respondent. For Petitioners: James Powers and Marc L. Spitzer
For Respondent: Patricia Beary PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax and Increased Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6621(c)
1983
$ 8,143
$ 407.15
[1]
$ 2,442.90
[2]
1984
7,497
374.85  [1]
$ 2,249.10
[2]
1985
6,804
340.20  [1]
$ 2,041.20
[2]
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are as follows: 1. Whether *621 petitioners are entitled to depreciation deductions and tax credits for investments in sale-leaseback programs for solar hot water heaters; 2. Whether petitioners are liable for the negligence addition to tax under section 6653(a)(1) and (2); 3. Whether petitioners are liable for an addition to tax for valuation overstatements under section 6659; and 4. Whether petitioners are liable for increased interest on tax-motivated transactions under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Seymour Sacks and Star Sacks were husband and wife during the taxable years in issue and resided in Arizona at the time they filed their petition in this case. The term petitioner in the singular hereinafter will refer to petitioner Seymour Sacks. Petitioner is admitted to practice as an attorney in the State of Arizona, and, at all times pertinent to this case, practiced law there. His law practice is general business, corporate, or commercial law, including business counseling, corporate, real estate, leasing, debtor/creditor, *622 and health care matters. Petitioner's first position as an attorney was with the Civil Fraud Division of the Department of Justice where he worked for 2 years. Petitioner's Investment Experience
During the years in issue, petitioner had real estate investments in both improved and unimproved property. He never sought the advice of his accountant concerning his real estate investments because he was quite comfortable making his own decisions. Petitioner and a friend had formed an equipment leasing partnership, and petitioner had been involved in the purchase and lease of an 80-ton crane which was still in service in the Phoenix area at the time of trial. He also had a small company that leased refuse removal boxes. Petitioner had traded some stocks and stock options. Bertram Trobman
In the early 1970s petitioner met Bertram Trobman. Trobman had a degree in business administration and was a real estate broker and Certified Public Accountant (CPA). Trobman had practiced as a CPA for 14 years but left accounting and entered corporate finance in 1975. Petitioner and Trobman were longtime friends, had been involved in many social and charitable activities together, *623 and had had many business dealings prior to the years in issue. Petitioner's law firm provided legal services to at least one of Trobman's companies prior to the years in issue. Trobman's corporate finance work, organized as Business Financial Services Corp. (BFS), an Arizona corporation, consisted of leasing, factoring, and financing transactions. Through BFS, Trobman was involved in leasing a variety of equipment, including photocopiers, cranes, office equipment, and furniture. For approximately 3 years, from 1980 to 1983, Trobman and an unrelated individual each held shares representing a 50-percent interest in BFS. After 1983, Trobman was the sole shareholder of BFS for about a year. In late 1981 or early 1982, someone in Trobman's office suggested to him that BFS should enter into the field of solar equipment leasing. Trobman was initially skeptical because he was not familiar with leasing consumer products, but he agreed to look into the idea. He spent a considerable amount of time investigating solar equipment leasing and began to view it as a good business opportunity. Trobman began his investigation at the library. In his initial investigations he learned that solar *624 water heaters had generally been marketed to affluent families who could afford the cost of the systems and who could use the tax benefits. He concluded that a significant number of homeowners with large families would not be financially capable of purchasing solar water heating equipment and could not use the tax benefits. He decided to target these families who could use the benefits of reduced energy costs but could neither purchase the equipment nor use the tax benefits. In considering the commercial viability of leasing solar water heaters, Trobman looked to other items homeowners rented (water softeners, televisions, appliances, etc.) and spoke to people who were in the business of leasing these types of equipment. Trobman was told by these people that once consumers initially rented an item, they would make their monthly payment indefinitely and would just continue to use the equipment. Analogizing a solar water heater to the plumbing inside a house, Trobman assumed that the equipment had at a minimum a 20-year economic life. Trobman, however, had no particular expertise or knowledge about solar water heaters and had no information to support his economic-life assumption. *625 Utility Rate Predictions
Arizona Public Service (APS) and Salt River Project (SRP) were the two local utilities that provided electric service in the early 1980s in the Phoenix area. These two utility companies were also building a nuclear power plant, Palo Verde, west of town. Construction of Palo Verde began in 1975. In the late 1970s or early 1980s, APS and SRP requested a fairly substantial rate increase to recoup construction costs. The Arizona regulatory authority, and ultimately the courts, denied the requested rate increase. However, some people anticipated that once the nuclear plant went on line, the cumulative costs could double the rate base and could dramatically increase the cost of electricity to consumers. During this period gas rates were decontrolled, and some people feared that gas rates could rise dramatically. Solar Water Heater Technology
There are two general types of solar water heaters, active and passive. An active system generally places the storage tank remote from the solar collector and includes a pump activated by a differential controller and a thermostat to circulate water through the collector and to the storage tank. Active *626 systems use both solar and electrical energy. A passive system generally places the storage tank on the rooftop linked to the solar panels and generally includes no pumps, differential controls, or moving parts. Thermosyphoning is one type of technology used in passive systems. In a passive system based on thermosyphonic principles, the sun heats the collector surface and heats the water; the hot water rises to the top of the storage tanks. Cold water now displaced to the bottom of the tank in turn is heated and rises to the top, causing the water to circulate. Water displacement and circulation are the fundamental principles of thermosyphonics. Trobman considered the merits of both active systems and passive thermosyphon systems for the prospective leasing activity. Active systems would require installation and removal work both inside and outside a house. Removal of a passive system could be accomplished without entry into the home. He considered ease of removal an important factor for a leasing program. Trobman also concluded that "passive" systems were more efficient and would last longer than "active" systems. Trobman had no engineering expertise and used Arizona Solar *627 Energy Commission performance ratings to compare different systems. To ensure that his systems comparisons would be relevant, Trobman limited his inquiry to thermosyphons. There was no established market for solar water heating systems in the United States in the late 1970s. American companies did not generally manufacture or market passive thermosyphon systems in the United States in 1982. However, some foreign-produced thermosyphon solar water heaters were available for sale in the United States. Trobman learned of three major foreign manufacturers, Solarhart of Australia, Solar Edwards of Australia, and Amcor of Israel. The Amcor Solar Water Heater
Amcor Group, Ltd., is a New Jersey corporation and is the wholly owned subsidiary of Amcor, Ltd., an Israeli corporation. Amcor, Ltd., and all of its subsidiaries (hereinafter collectively referred to as "Amcor") were a large multinational appliance manufacturing conglomerate. Amcor solar water heating systems have been in service in homes worldwide since 1965. Amcor began selling its solar water heaters in the United States in the late 1970s and in 1980 established its California office to sell thermosyphons. Prior *628 to 1980, Amcor sold only active systems in the United States. Trobman focused on Amcor because it was a very large company with distribution all over the world, it had been manufacturing solar equipment since 1947, and the quality and durability of its equipment seemed to be superior. Trobman first met Joseph Conrad, the marketing director and later the vice president of Amcor's Solar Division, at a trade show in Phoenix put on by the City of Phoenix and the Israeli consulate. After the trade show, Trobman traveled to Los Angeles on several occasions to meet with Conrad and other representatives of Amcor. Trobman then traveled to Israel to visit three different factories that were manufacturing similar equipment. He selected Amcor based on its size, track record, and stability. While in Israel, Trobman met with Uri Bernstein, president of Amcor. Trobman and Bernstein came to a general understanding, but Trobman did not enter into a contract with Amcor at that time. Instead, Trobman waited until his return to the United States and conducted contract negotiations with Amcor's Los Angeles office. He actually negotiated with Dov Gazit, who was the vice president of Amcor's Solar *629 Division until October of 1982. While in Israel, Trobman told Amcor personnel that he would need a system large enough to heat sufficient water for a family of six to eight. At that time, Amcor marketed two different thermosyphon models in the United States -- the Solon 120 and the Solon 170. The Solon 120 had approximately a 32-gallon tank with a 26-square-foot collector, and the Solon 170 had a 45-gallon tank with a 34-square-foot collector. The Solon model numbers correspond with the systems' storage capacity in liters, i.e., 120 liters and 170 liters. Amcor personnel suggested the combination of two Solon 120s to create the Solon 240 to meet Trobman's needs. The Solon 240 did not exist prior to Trobman's trip to Israel. The proposed Amcor Solon 240 consisted of two solar collector panels totaling 51.2 square feet attached to two water storage tanks with a combined 64-gallon capacity. The Solon 240 would be designed for installation on both pitched and flat roofs. At Trobman's request, the proposed Solon 240 included an "Active System Package" that consisted of a 4,000 watt electric heating element and a pump and timer to equalize the water temperature in the two tanks. *630 The pump would run twice daily for a total of 45 minutes. Without the pump a temperature imbalance between the two tanks would occur due to their serial configuration. The heating element would ensure the presence of hot water on days when solar energy alone was inadequate to heat the water. The pumps, timers, and heaters were not a standard feature on Amcor's solar equipment, and Amcor did not manufacture these items. Both tax and efficiency considerations motivated Trobman's request for the "Active System Package". The pump was required in order for the equipment to qualify for the Arizona tax credit for solar equipment. Amcor engineers made the necessary modifications to make the two Solon 120 units work as one system, the new Amcor Solon 240. Trobman's Agreement with Amcor
After Trobman left Israel and returned to Phoenix, in August or September of 1982, he made several trips to Los Angeles, accompanied by Joyce Geyser, an attorney in petitioner's law firm. Trobman and Geyser negotiated a purchase contract with Amcor, dated August 24, 1982, on behalf of a newly formed, wholly owned subsidiary of BFS, called BFS Solar, Inc. (BFS Solar). [1] In that contract BFS Solar *631 agreed to purchase at least 500 Amcor Solon 240 solar units by December 31, 1982. The purchase price of each Solon 240 unit was $ 1,010, plus an amount not to exceed $ 100 for an "Active System Package", f.o.b. a Phoenix warehouse. The price ultimately agreed upon for each Solon 240 unit equipped with the "Active System Package" was $ 1,080. The agreement was contingent upon Amcor's delivery of at least 500 Solon 240 units to Amcor's Phoenix warehouse no later than December 24, 1982, and upon BFS Solar's receipt of a tax opinion, satisfactory to BFS Solar in its sole discretion, that the sale of the solar units from BFS Solar to purchasers would be eligible for all applicable Federal and State solar and business tax credits. BFS Solar was to pay the full purchase price of each unit in cash at the time of purchase, whereupon Amcor would surrender possession of the unit, giving BFS Solar a bill of sale. The agreement included a liquidated damages clause that provided that if BFS Solar failed to purchase at least 500 solar units, Amcor would be entitled to recover $ 100,000. Amcor's rights under the liquidated damages provision were secured by a $ 100,000 letter of credit. Amcor *632 warranted the Solon 240 units for 5 years. The "Active System Package" was under a separate warranty that was the greater of 1 year or the term of any full manufacturer's warranty given to Amcor with respect to the package components. [1]
When he was negotiating with Amcor, Trobman knew that Amcor already had an authorized dealer in Phoenix, Smith Pipe and Steel. Amcor required BFS Solar to agree to purchase a minimum of 500 units in order to acquire exclusive Amcor dealership rights. [2]
*633 Until 1982, Amcor had limited sales of about 60 to 100 units a month and was targeting retailers who sold directly to homeowners. In the beginning, Amcor had more difficulty marketing thermosyphons than marketing active systems because many homeowners did not like the idea of having a water tank on their roof. At the time he approached Amcor, Trobman was able to persuade Amcor personnel that he could sell large numbers of units as tax shelters and that the proposed programs had been carefully planned and would succeed. The sale of 1,000 Solon 120 units (500 Solon 240 units) would take Amcor to a much higher level of sales than it had previously achieved; thus, Trobman's proposal was beyond Amcor's sales expectations at that time. However, Amcor would have sold Solon 240 units to any other investor on the same terms as it sold them to BFS Solar. Amcor's First Delivery of Solon 240 Units to the United States
BFS Solar obtained the $ 100,000 letter of credit required under the August 24, 1982, agreement with Amcor. Trobman also arranged for the rental of a warehouse in Phoenix for Amcor. Amcor shipped the Solon 240 units from Israel to the Port of Los Angeles and thence *634 to Phoenix. Amcor delivered the Solon 240 units to its Phoenix warehouse in 1982 as required under the agreement of sale. BFS Solar did not have keys to Amcor's Phoenix warehouse; the Solon 240's in that warehouse still belonged to Amcor, and Amcor controlled the shipments going into and coming out of the Phoenix warehouse. BFS Solar actually bought and paid for 155 Solon 240 units from Amcor in 1982. It may also have purchased and paid for another 3 or 4 units that year to be used for spare parts or replacement units. BFS Solar moved the Solon 240's it had paid for into its own warehouse. Amcor continued to rent the warehouse space needed to store the Solon 240's that Amcor had shipped to Phoenix but that BFS Solar had not yet paid for. Amcor retained that warehouse space throughout 1983 and thereafter shipped back to Los Angeles those units BFS Solar failed to pay for. The 1982 Placement Memorandum
BFS Solar gave prospective investors a placement memorandum detailing the 1982 Solar Equipment Leasing Program (the Placement Memorandum). The basic concept was that the investor would purchase the solar water heater units, a minimum of at least three, and rent them to *635 homeowners. The Placement Memorandum was silent as to how the investor was to conduct the rental activity, and BFS Solar made no representations that it would either lease the units from the investor or help the investor locate potential homeowner-lessees. The Placement Memorandum expressly stated as follows: BFS Solar is a dealer for Amcor Solon systems and is not in the business of equipment leasing or management. BFS Solar recommends that you engage a qualified lease/management company, which can help make your venture successful by providing some or all of the following services: [listing some 14 services]. BFS Solar cited ArizonaSolar Power as such a company but did not guarantee that company's services. In fact, despite the statements in the Placement Memorandum, the investors in the 1982 Leasing Program leased the units back to BFS Solar for an initial 53-month period, just as the investors in the 1983 program did. The 1982 Placement Memorandum cited the Arab oil embargo, the decontrol of natural gas prices, and the construction of the Palo Verde nuclear facility as factors effecting a sharp rise in future energy rates charged by the public utilities. It cited *636 APS rate increases of 5 to 9 percent in the early 1970s, followed by increases of 17.7 percent and 15.8 percent in 1975 and 1976, respectively, and moderate rate increases of 5 percent to 6 percent thereafter, ending with a 24.4 percent rate increase in 1981. [3] The Placement Memorandum predicted that energy rates would continue to increase faster than the overall inflation rate for the next few years. The Placement Memorandum stated that an Amcor Solon hot water system could cut a homeowner's water heating costs by as much as 85 percent. Moreover, the Placement Memorandum said that leasing a solar water heater would significantly reduce *637 the homeowner's out-of-pocket expenses by eliminating the initial cash outlay required to buy a system. The Placement Memorandum stated that Amcor had designed the Solon 240 to serve a household of six to eight people and observed that a typical family of four persons would use over 80 gallons of hot water every day, at a monthly cost of $ 28 to $ 30. The memorandum described the intended market as middle class homeowners, i.e., people who own homes in the price range of $ 35,000 to $ 100,000. The leasing program would focus on middle class homeowners because they represented the largest number of homeowners and because they were the least likely to purchase a solar water heater due to the required cash outlay. BFS Solar recommended in the Placement Memorandum that investors engage the management, collection, and accounting services of ArizonaSolar Power, at a cost of 15 percent of the total monthly collections. The Placement Memorandum also stated that ArizonaSolar Power planned an advertising campaign that might include television, radio, magazines, and newspapers. The record does not disclose the identity of ArizonaSolar Power. The Placement Memorandum discussed the *638 prospect of long-term cash flow to the investor and attractive tax incentives, including income tax credits of up to 60 percent of the purchase price of each unit. The Placement Memorandum stated that the tax incentives would result in the recovery of the investor's initial cash investment within a short period of time but cautioned the investor to consult his or her own tax advisor to determine the effect of the potential tax benefits on the particular investor's tax liability. Attached as an appendix to the Placement Memorandum was a letter, dated September 3, 1982, from the firm of Toback, Rubenstein, Feldman, Murray & Freeman, Certified Public Accountants, affirming the equipment's eligibility for a 25 percent Federal investment tax credit (10 percent regular Federal investment credit, plus 15 percent Federal energy credit), and a 35 percent Arizona Commercial Solar Tax Credit. On August 18, 1982, Robert Jones of Toback, Rubenstein, Feldman, Murray & Freeman had written to the Arizona Department of Revenue, explained the investment, and requested a favorable ruling on the investors' entitlement to the state credit. The record does not indicate whether the Arizona Department *639 of Revenue ever ruled on that request. The Placement Memorandum contained a summary that forecast a tax benefit recovery of the investors' initial cash outlay after the second year and raised the prospect of approximately $ 1.89 in tax benefits for each dollar invested (not taking into account the time value of money). It also contained three 13-year cash flow projections for a single Solon 240 unit that assumed yearly electric rate increases of 12 percent, 15 percent, and 18 percent. Each Solon 240 unit would cost an investor $ 4,800 to be paid as follows: $ 1,400 in cash in 1982; $ 1,400 by a non-interest-bearing promissory note, due and payable in 1983; and $ 2,000 by a 9 percent simple-interest-bearing promissory note to be repaid out of lease revenues, but stated to be in all events due and payable in 10 years. To develop the three projections, BFS Solar forecast an initial cash investment of $ 1,400 in 1982 with an additional $ 1,400 cash payment in 1983. BFS Solar forecast lease revenue of $ 24 per month, or 80 percent of the total energy cost per month for a family of four, with that electric rate increasing each year at a rate of either 12 percent, 15 percent, or 18 *640 percent. BFS Solar assumed six months' rental revenues in the year of installation. Interest projections for the $ 2,000 promissory note were calculated at 9 percent simple interest on the unpaid principal balance. The projections applied 65 percent of lease revenues first to accrued and accumulated interest on the note and then to principal. If revenue was insufficient to cover accrued interest in a given year, the unpaid interest was accumulated but earned no further interest. BFS Solar forecast depreciation over 5 years using the Accelerated Cost Recovery System. The projections assumed that the investor would pay an initial home location fee of $ 200 in 1982 and an additional $ 500 when the system was installed in 1983. The projections also assumed that investors would pay a 15-percent fee for the billing, collection, and administrative services of a third party. BFS Solar calculated the projected tax benefits attributable to losses flowing from the investment at a 50 percent rate. BFS Solar calculated the regular and energy percentages of the Federal investment tax credit at 10 percent and 15 percent, respectively, in 1982, the first year the systems were available for *641 rent. Finally, BFS Solar calculated the Arizona Commercial Energy Credit at 35 percent of the system's cost and forecast it for 1983, the year of the system's installation. The projections in the Placement Memorandum were based on unreasonable assumptions as to the annual percentage increase in electric rates over a long period of time and as to the percentage of such utility costs that a homeowner would pay to lease the solar water heater unit. In any event, there is no evidence that petitioner ever saw or relied upon the Placement Memorandum. Moreover, the leasing program was not conducted in the manner contemplated by the Placement Memorandum. Petitioner's Investment in BFS Solar's Sale-leaseback Program
Petitioner gained familiarity with BFS Solar's 1982 Solar Equipment Leasing Program through his firm's legal work for Trobman and his corporations. At some point Trobman approached petitioner and asked him to invest in the program. Petitioner and at least three other lawyers in his firm ultimately invested in BFS Solar's Solar Equipment Leasing Program. Petitioner had no involvement in drafting the Placement Memorandum or the attached tax opinion, since neither he *642 nor his firm had any securities or tax experience. Petitioner may have reviewed or discussed some of the other documents with Trobman before they were finalized. Although his firm drafted some, if not most, of the transactional documents signed by investors, petitioner did not personally have any substantial involvement in the drafting. In deciding whether to invest in Trobman's leasing program, petitioner discussed the deal with Joyce Geyser and Mike Rooney, two business lawyers in his firm. Geyser was involved in negotiating the contract between Amcor and BFS Solar, but there is no evidence that she or Rooney had any particular knowledge about solar water heaters or any knowledge as to the economics of investing in a leasing program involving such water heaters. Petitioner also talked to Ed Villanueva, his accountant for many years, and to Harold Toback, a longtime friend and associate and the head of Toback, Rubenstein, Feldman, Murray & Freeman, a large accounting firm in Arizona. Again, there is no evidence that either of these individuals were knowledgeable in those areas. Petitioner also spoke with Trobman about Trobman's investigative efforts. Trobman gave petitioner *643 some information concerning the prices others were asking for solar water heaters. The $ 4,800 stated purchase price BFS Solar quoted for the Amcor Solon 240's was about the middle of the range of prices for other solar water heaters that were being sold directly to homeowners at retail prices at that time. Amcor Solon 240 units had not previously been sold, and Amcor generally had been selling active solar water heater systems, rather than thermosyphonic passive systems. However, petitioner had formed an impression that climate-sensitive products developed in Israel incorporated more appropriate technology due to the similarity in climate between Israel and Arizona. Petitioner knew that Amcor was one of the larger companies selling solar energy products. He concluded that the price was fair for a unit installed on a homeowner's rooftop. He considered the price to include any delivery and installation costs. Before committing himself to the 1982 investment program, petitioner sought no advice from any individual or organization with recognized expertise in forecasting electric rates or energy costs. Essentially, petitioner relied upon his longtime friend and client, Trobman, *644 who asked him to invest in the program. In making his decision to invest in the 1982 sale-leaseback program, petitioner also considered the potential tax benefits. He anticipated being able to utilize all of the tax credits the investment program was designed to yield. Petitioner's 1982 Investment -- Cash and Notes
On December 30, 1982, petitioner paid BFS Solar $ 8,000 by check. He also signed several promissory notes in favor of BFS Solar. The first note was a 9 percent simple-interest-bearing promissory note, dated December 30, 1982, in the amount of $ 4,000 due and payable to BFS Solar on or before September 1, 1983. This note was stated to be recourse and provided for an increased rate of interest -- 18 percent -- if petitioner had not paid its balance by the due date. The second note was a 9 percent simple-interest-bearing promissory note, dated December 30, 1982, in the amount of $ 4,000 due and payable to BFS Solar on or before December 1, 1983. The note was stated to be recourse and provided for an increased rate of interest -- 18 percent -- if petitioner had not paid its balance by the due date. The third note was a 9 percent simple-interest-bearing promissory *645 note, dated December 30, 1982, in the amount of $ 8,000 due and payable to BFS Solar on or before April 1, 1984. The note was stated to be recourse and provided for an increased rate of interest -- 18 percent -- if petitioner had not paid its balance by the due date. The fourth and final note was stated to be a recourse, 9 percent simple-interest-bearing promissory note, dated December 30, 1982, in the amount of $ 24,000 due and payable to BFS Solar on or before December 30, 1992. The note provided that 85 percent of the gross income from leases of the equipment would be applied to payments on the note. The note provided that lease income would be applied first to interest and then to principal. If lease income was insufficient to cover interest accruals, any unpaid interest would be added to the next period's interest accruals. No other payments on the note were contemplated, although the unpaid balance and accrued interest were stated to remain due and payable at maturity. This combined total of $ 48,000 in cash and notes was the stated purchase price of ten Solon 240's. The record establishes that petitioner actually paid a total of $ 20,000 in cash in connection with the *646 1982 program, the $ 8,000 in 1982 and $ 12,000 in 1984 or 1985. There is no evidence that he paid any of the interest on any of the short-term promissory notes. Purchase Money Security Agreement and Assignment of Rents
In connection with the ten Solon 240's, petitioner signed a document, dated December 30, 1982, entitled Purchase Money Security Agreement and Assignment of Rents. This document provided BFS Solar a security interest in the equipment and any rents therefrom to secure payment of the promissory notes petitioner had given to BFS Solar. The document also assigned 85 percent of the gross receipts from the equipment to BFS Solar and provided that payment of all sums due from the equipment's lessees would be made directly to BFS Solar. The document gave BFS Solar the right to accelerate all remaining payments in the event of a default and to sell the equipment and apply the proceeds toward the balance due on the notes. Petitioner also signed an Arizona Uniform Commercial Code Financing Statement -- Form UCC-1 -- dated December 30, 1982, giving BFS Solar a security interest in the ten Solon 240's. Leaseback Arrangement
Petitioner (as lessor) signed a Personal *647 Property Lease dated December 30, 1982, with BFS Solar (as lessee) for the lease of ten Solon 240's commencing on December 30, 1982, and continuing for 53 months. Payment under the lease had two components. The first component was base rent of $ 12,029.50, payable in 53 separate installments (regardless of whether the equipment was actually leased to homeowners) as follows: -- TOTAL MONTHLY RENTAL -- MONTHS
RENT PER UNIT
10 UNITS
1 - 12
$ 10.20
$ 102.00
13 - 24
21.93
219.30
25 - 36
25.22
252.20
37 - 48
29.00
290.00
49 - 53
33.35
333.50
The second component was 50 percent of all rents received from any sublease, less the base rent. The first lease payment was due on January 31, 1983, and each subsequent payment was due on the last day of each month. BFS Solar received the right to possess the units during the term of the lease, but all right, title, and interest was stated to remain with petitioner. The lease required BFS Solar to pay when due all assessments, sales, use, property, excise, and other taxes imposed on the equipment by any government, excluding any taxes on or measured by petitioner's net income. BFS Solar bore the risk of physical loss caused *648 by damage, theft, or destruction of the equipment, and no such loss would impair BFS Solar's obligations under the lease. The lease required BFS Solar to bear all maintenance costs at its own expense. If BFS Solar defaulted under the lease, petitioner had the right to accelerate and to sue for all remaining payments. Petitioner had the right to demand a report of the location of the leased equipment, the names of any sublessees, and copies of any sublease agreements. The lease stated that neither BFS Solar nor petitioner intended it to be a conditional sale agreement, chattel mortgage, or security agreement. The effect of this lease was to make BFS Solar responsible for finding homeowner-lessees for the initial 53-month leaseback period. However, BFS Solar was not expressly obligated to sublease the Solon 240's. Management Services Agreement
On December 30, 1982, petitioner also entered into a 53-month Management Services Agreement with BFS. Under the Management Services Agreement petitioner appointed BFS as his agent for the collection, disbursement, and accounting of rental income and payment of related expenses. The agreement required BFS to keep books of account *649 of all receipts and disbursements and to make the books available to petitioner at all reasonable times. For purposes of preparing petitioner's income tax return, at the end of the year BFS was obligated to render a recapitulation statement reflecting all receipts and disbursements. For its services BFS was to receive 15 percent of the gross monthly rentals actually received. BFS would deduct its compensation directly from receipts and pay the remainder to BFS Solar according to the Purchase Money Security Agreement and Assignment of Rents. BFS never modified the 15 percent compensation rate in its 1982 Management Services Agreement with petitioner. [4]
*650 National Public Service -- A Private Utility
In marketing the Solon 240's to homeowners, BFS Solar represented itself as being a private utility company. After April 30, 1983, BFS Solar conducted its solar equipment leasing business as National Public Service (NPS). It adopted the name National Public Service to sound more like a utility company. Instead of emphasizing the rental relationship, BFS Solar told homeowners that it would sell them energy for less money than the public utility companies. Homeowner Service Agreements
The equipment "lease" entered into with each homeowner was entitled "Homeowner Service Agreement," was for a 2-year term, and was drawn with NPS as the service provider. These agreements provided that homeowners would not be obligated to make monthly payments during the 2-year term. The agreements provided that once the initial 2-year lease terms expired, NPS would notify the homeowner of its monthly service charge. Moreover, the homeowner could request the removal of the system at any time. The Homeowner Service Agreements required the homeowners to pay $ 576 for the cost of any installed parts that became a permanent part of the house. *651 The 1982 Placement Memorandum had stated that the investor would pay $ 700 per unit for homeowner location and installation services. However, homeowner location and installation services were actually included in the stated $ 4,800 purchase price of the Solon 240 paid by the investor. The investor's installation charge theoretically covered the installation of parts that went on top of the roof, while the installation of parts below the roof, i.e., permanent part of the house, theoretically was the homeowner's responsibility. With this system BFS Solar would not have to enter a house to remove the equipment. BFS Solar contracted out the actual installation because it did not have a contractor's license as required by Arizona law. BFS Solar used several different subcontractors for the installation. BFS Solar was responsible for answering service calls from homeowners. When equipment malfunctions occurred, homeowners called BFS Solar. The investors had no responsibility for maintenance or service calls in regard to the Solon 240 units. Typically, homeowners would shut their electric water heater off in the summer, because there was no need for a backup. These same homeowners *652 would then forget that they had turned their electric water heater off, and when they did not get any hot water in October or November they would call BFS Solar and complain. BFS Solar personnel would try to direct the homeowners over the telephone, but often a house call was required. When BFS Solar personnel made a house call and simply flipped a circuit breaker, BFS Solar did not charge the homeowner. Another typical service call involved the system's freeze protection. Amcor had designed the systems to allow expanding water to leak out when the ambient temperature approached freezing. Homeowners would think the water escaping from a properly operating system was a leak and report the "leak" to BFS Solar. BFS Solar personnel would make a house call and explain the reason for the escaping water to the homeowner, but the homeowner would call BFS Solar back when it happened again the following year. BFS Solar received many telephone calls from homeowners regarding the Solon 240's and made many house calls as a result. Moreover, Amcor received complaints about the Solon 240's sold to BFS Solar and sent an expert to Phoenix to determine the cause. The add-on heating elements *653 had burned out, and Amcor had to replace them. Amcor Solon 240's Were Actually Leased to End-Users
BFS maintained separate files for each investor containing, in part, lists of the names and addresses of the homeowners to whom BFS Solar had leased the equipment. In 1983, BFS Solar leased the 10 Solon 240's involved in petitioner's 1982 investment to nine homeowners and one landlord. The 10 Solon 240's were all installed in 1983. By the end of 1983, all of the 155 Solon 240's identified with investors under the 1982 investment program were leased to homeowners. BFS Management Fee
BFS was to collect its management fee out of the rents paid by the homeowners. However, under the terms of the leases with the homeowners, no rents would be paid for the first 2 years. The investors did not pay BFS any compensation during the 2-year period. In fact, no money was to ever change hands, and any payments of fees were strictly bookkeeping entries. The accounting services BFS was to perform under the Management Services Agreements consisted of preparing statements for investors indicating the amount of rent collected and the amount withheld as a management fee, preparing amortization *654 schedules for investors' promissory notes, preparing and submitting annual tax information, and answering investors' questions regarding the investment program's tax and economic ramifications. The record does not disclose whether or to what extent these services were ever rendered. Arizona Solar Energy Commission Pamphlet
In May 1983, the Arizona Solar Energy Commission published a pamphlet entitled "Solar Water Heating for Arizona Homes", a practical guide for Arizona homeowners who were considering installing a solar water heater. On the subject of future rates for electricity and gas, the pamphlet noted that electricity rates had increased by 200 percent over the last 10 years at approximately 1-1/2 times the rate of inflation. The pamphlet stated that the most conservative forecasts indicated electricity rate increases of about 7 or 8 percent per year for the next 10 years. In discussing the economics of solar water heating, the pamphlet stated that a family of six could expect to save $ 360 per year on its APS bill or $ 311 on its SRP bill, assuming that solar energy substituted for 70 percent of electric energy demand, that a hypothetical conventional heater's water-set *655 temperature was 140 degrees, that each person used 20 gallons of hot water each day, and that the solar energy system was 84 percent efficient for standby losses. These estimates did not take into account the $ 5 to $ 30 per year cost of electricity to run any pumps for the solar energy equipment. To select a solar energy system that would substitute for 70 percent of a six-member household's electric energy demand for hot water, the homeowner could consult a handy table put together by the pamphlet's author which recommended a collector area of 84 to 108 square feet. This figure assumed that: the collector was a flat plate collector; the collector faced within 45 degrees of due south; the collector would tilt up 23 degrees to 50 degrees from horizontal; and the hot water demand was 20 gallons per person per day at 140 degrees Fahrenheit. As noted above, the Amcor Solon 240's collector size was 51.2 square feet. Another method for determining proper collector size utilized the collector's Solar Rating and Certification Corp. Rating or SRCC Rating. To use this method the homeowner first had to determine how much solar heating his or her household would require. The head of a *656 six-member household in Phoenix would compute this figure as follows: A British Thermal Unit (Btu) is the amount of heat required to raise the temperature of one pound of water by one degree Fahrenheit. The average inlet water temperature in Phoenix is 78 degrees. Each gallon of water weighs approximately 8.3 pounds. Accordingly, assuming a water set temperature of 140 degrees, 61,752 Btu's would provide enough hot water (120 gallons) to meet the needs of a six-person household for one day (8.3 pounds X 120 gallons X (140 degrees - 78 degrees)). The next step in the SRCC rating method was to determine the Btu rating of the particular solar collector or the system. Once the homeowner had determined the SRCC rating, he or she could simply compare the household's Btu demand to the SRCC rating. The homeowner could expect the system to provide the same percentage of the household's daily hot water needs as the SRCC system rating divided by the household's daily Btu demand. The rating for the Amcor Solon 120 system was 20,100 Btu's, and presumably, the Solon 240 was 40,200. Accordingly, the Solon 240 would provide 65 percent of the Btu's required by a six-person household on a daily *657 basis. [5]
On the subject of storage capacity, the pamphlet recommended that the tank be capable of holding about as many gallons of water as the household would use in 1 day. Assuming that, on average, a six-person family would consume 120 gallons of hot water each day, the Solon 240's 64-gallon storage capacity does not meet the Arizona Solar Energy Commission's guidelines. Prospectus for 1983 Investment Program
Having purchased only 155 Solon 240's from Amcor for the 1982 leasing program, BFS Solar was still under an obligation to buy *658 at least the balance of the original 500. Trobman devised a new Solon 240 investment-leasing plan (the 1983 investment program), and BFS Solar gave propsective investors copies of a prospectus, dated August 1, 1983, together with a November 15, 1983, amendment. The prospectus stated that the program's objectives were: (1) to provide rental income from leasing the Equipment, and (2) to generate an Investment Tax Credit and Energy Tax Credit as provided for in the Internal Revenue Code, a Solar Energy Credit under Arizona Revised Statutes Section 43-1077, and certain other tax benefits. The prospectus announced that: PROSPECTIVE INVESTORS MUST REPRESENT THAT THEY HAVE SUFFICIENT KNOWLEDGE AND EXPERIENCE TO UNDERSTAND THE FEDERAL AND STATE INCOME TAX IMPLICATIONS OF AN INVESTMENT IN THE UNITS AND/OR THEY WILL OBTAIN THE ADVICE OF THEIR ATTORNEY, TAX CONSULTANT, AND/OR BUSINESS ADVISOR WITH RESPECT TO THE LEGAL, TAX, AND BUSINESS ASPECTS OF THIS INVESTMENT PRIOR TO SUBSCRIBING FOR UNITS. Units will be sold only to qualified investors who (1) make a minimum purchase of 5 Units ($ 24,000) and (2) are bona fide residents of the State of Arizona. Additionally, each investor must *659 represent in writing that he has a net worth (exclusive of home, home furnishings, and personal automobiles) of at least $ 30,000 in excess of his cash purchase price and he expects to report taxable income on his Arizona Income Tax Return of at least $ 45,000. * * * Reasons for establishing these standards include the risks inherent in the Offering, and the fact that the tax credits generated by an investment in Units may be utilized only to the extent that the investor has taxable income. * * * The prospectus stated further that: BFS Solar, Inc. will rely on the opinion of tax counsel regarding certain tax aspects of the transaction described in this Prospectus. It will not request a private tax ruling from either the Internal Revenue Service, or the Arizona Department of Revenue regarding any such tax aspects. However, through its representatives BFS received an opinion from the Arizona Department of Revenue that the equipment it sold in 1982, under a similar program, generally qualified for the Arizona solar credit. [6] * * * [Fn. added.] *660 Under the heading "Risk Factors" the prospectus provided as follows: 1. Federal and State Income Tax Considerations. The tax opinion attached hereto (see APPENDIX I - "TAX ASPECTS-TAX OPINION") indicates that, in the opinion of tax counsel to BFS, investors are more likely than not to receive the majority of the tax benefits associated with an investment in the Program. However, prospective investors should be aware that an opinion of counsel is not binding on Internal Revenue Service, and that no ruling has been requested from the Internal Revenue Service regarding any aspect of the Program. The Service could challenge an investor's tax position with respect to the Program on any of a number of grounds, the most likely of which are summarized in this Section, which is qualified in its entirety by express reference to Appendix I-"TAX ASPECTS-TAX OPINION". [Listing eight possible areas that might be challenged by Internal Revenue Service.] * * * BECAUSE THE TAX ASPECTS OF THE PROGRAM ARE COMPLEX, AND CERTAIN OF THE TAX CONSEQUENCES WILL NOT BE THE SAME FOR ALL INVESTORS, EACH INVESTOR IS STRONGLY ADVISED TO CONSULT WITH HIS OWN TAX ADVISOR IN CONNECTION WITH THE TAX ASPECTS *661 OF THE PROGRAM. 2. Reliance on BFS Solar, Inc. and Its Affiliates. As discussed above in paragraph 1 of the "Income Tax Considerations" subsection of this "RISK FACTORS" section, the ability of the Investor to claim the Arizona Solar Energy Credit will be conditioned upon installation of the Equipment by BFS Solar, Inc. In accordance with the terms of the Program, BFS Solar, Inc. will not be the ultimate user of the Equipment. Rather, all of the Equipment is to be installed on properties held by parties to whom BFS Solar, Inc. subleases. The Investor will rely primarily on the ability of National Public Service, a division of BFS Solar, Inc., to market the Equipment for subleasing to ultimate users. National Public Service was formed in May 1983 and has, therefore, only a limited amount of experience in such activity. Although the Equipment Manager, Business Financial Services Corp., has experience in managing other types of equipment it has had no direct prior experience in the management of the Amcor Solon 240 Systems. See "PRIOR PROGRAM". * * * 4. Competition. The selling and leasing of solar water heating equipment is a highly competitive business. The Program expects *662 to encounter competition from other equipment lessors and manufacturers of solar equipment, who may be offering solar equipment which is similar to the Equipment, some or all of which solar equipment may be offered for sale and/or lease at prices and/or on terms which are more favorable than those of the Program. Program Equipment will also compete with equipment of affiliated programs for subleasing to third parties. All such Equipment of this Program and affiliated programs will be subleased on a first purchased, first subleased basis to minimize the effect of such competition between the related entities. See "CONFLICTS OF INTEREST" and "PRIOR PROGRAM". 5. Limited History of Operation and Priority of Subleasing. National Public Service, as of July 12, 1983, had subleased 63 of the 155 systems which were leased from Investors in a prior program. See "PRIOR PROGRAM". National Public Service has, however, only been actively marketing the equipment of the prior program for sublease since June 1, 1983. All systems of the prior program will have priority in subleasing over the Equipment of this Program. Systems from both programs will be subleased on a first purchased, first *663 subleased basis. 6. Compensation to BFS Solar, Inc. and Management. BFS Solar, Inc. and its Affiliates will receive compensation from the sale and leaseback of the Equipment, regardless of whether or not the Investors receive distribution of net cash from the leasing of such Equipment. See "COMPENSATION TO BFS SOLAR, INC. AND ITS AFFILIATES". 7. Risk of Default on Lease. The lessee, BFS Solar, Inc., was incorporated in 1982 for the primary purpose of marketing and otherwise dealing in Amcor Solon 240 water heaters. The ability of BFS Solar, Inc. to make the payments required by the Lease will depend in part upon its ability to sublease. Investors will not be relieved of making payments on their promissory notes if BFS Solar, Inc. becomes unable to make its Lease payments to investors or otherwise defaults on the Lease. Any such offsetting of amounts due on the Notes with amounts owed under the Lease would generally require legal action by the Investor. 8. Residual Value of Equipment. Although the cash return from the Program is expected to come primarily from the effect of tax factors (see APPENDIX I--"TAX ASPECTS-TAX OPINION" and "PROGRAM OBJECTIVES") and revenue generated *664 from rental activities, the ultimate cash return will depend in part upon the residual value of the Equipment, and the ability to release such Equipment at the end of the Lease. Based on information from the manufacturer regarding an expected 15 year useful life, it is the belief of BFS Solar, Inc. that the Equipment will be totally operational and suitable for releasing when the original 53 month Lease terminates. However, the actual residual value of the Equipment at the end of the Lease will depend upon many factors beyond the control of BFS Solar, Inc., including equipment costs, technological obsolescence, demand, competitive factors, and economic conditions. 9. Risk of Default on Full Recourse Promissory Note. The Note to be executed by the Investor for one half (1/2) of the purchase price of his Units will be full recourse. Because the Notes are full recourse, an investor who defaults on his Note would be liable for any excess of the remaining principal balance, plus interest due, on such Note, over the amount which BFS Solar, Inc. could obtain from a sale of the Equipment securing the Note. The residual value of the Equipment, and hence, the amount which could be expected *665 from a sale of the Equipment, is expected to be substantially less than the remaining principal balance on the Note at the end of the 53 month Lease term. 10. Promissory Notes not Fully Amortized over Lease Term. At the end of the 53 month Lease term the Investor will still owe an amount equal to approximately $ 11,140 on the Note. Although BFS Solar, Inc. expects the Equipment to have a useful life of approximately fifteen years for leasing purposes, the residual value of the Equipment at the end of the Lease is expected to be substantially less than the principal balance remaining on the Note. 11. No Cash Distributions. Because payments made to investors by BFS Solar, Inc. pursuant to the Lease will be less than the amount due from investors on their Notes, no net cash distributions should be expected from the rental activities of the Program. See also paragraphs 8 through 10 of the "RISK FACTORS" section. 12. Lease Term. BFS Solar, Inc. will lease Equipment from the investors for a period of 53 months only. There is no provision for extension or renewal of this Lease, other than a provision that Business Financial Services Corp. will use its best efforts to release *666 the Equipment upon the end of the term of the Lease. Therefore, a potential investor should carefully consider the fact that a new lessee may need to be located at the end of the 53 month term in order to fully utilize the Equipment. There can be no assurance that such a lessee will be available. In a section of the prospectus entitled "CONFLICTS OF INTEREST", BFS Solar noted the 1982 program and the policy that all equipment would be subleased on a first purchased, first subleased basis. BFS Solar warned prospective investors that: Although neither BFS Solar, Inc. nor its Affiliates currently intend to sell any equipment directly to ultimate users, it is possible that they could engage in such selling efforts in the future, which sales could adversely impact the subleasing activities of the Program. However, it is the belief of BFS Solar, Inc. that the sales and leasing markets are sufficiently distinct to minimize the potential for any such conflict. In a section of the prospectus entitled "COMPENSATION OF BFS SOLAR, INC. AND ITS AFFILIATES" the prospectus disclosed the following: Form of Compensation
Method and Amount of Compensation
Underwriting Commissions
Underwriting compensation paid by
Payable to BFS
BFS Solar, Inc. equal to 10 percent
Securities, Inc.
of cash payment for each Unit sold
($ 240 per Unit). BFS Securities,
Inc. may associate other
broker/dealers to assist in selling
the Units.
Equipment Management Fee
A management fee equal to 16
Payable to Business
percent of the gross base rent
Financial Services Corp.
revenues, paid pursuant to Lease
terms, for services rendered. The
amount of such fee per Unit for the
53 month duration of the Lease will
equal a total of $ 212.45 per System
($ 1,062.25 per five Systems).
Promotional Interest of
BFS Solar, Inc.
The promotional interest of BFS
Solar, Inc. in the Program is
derived from the profit margin
built into the sales price of the
Equipment to the investors.
Although the exact amount of the
profit margin will depend on actual
costs and expenses, some of which
may vary from transaction to
transaction, BFS Solar, Inc. has
estimated that it will have a
profit margin of approximately $ 60
per System ($ 300 per five Systems)
from the initial cash payments and
approximately $ 1,280 per System to
be received over ten years out of
payments made on the Notes executed
for the remainder of the Unit
purchase price, for a total of
$ 1,340, or approximately 28 percent
of the purchase price of the
Equipment. National Public
Service, the division of BFS Solar,
Inc. which will market the
equipment for subleasing, will be
compensated for its service by BFS
Solar, Inc. and not by the
investors.
*667 Attached as an appendix to the prospectus was a 17-page letter, dated August 1, 1983, from the law offices of Jay I. Bartz, Ltd., affirming the equipment's eligibility for a 25 percent Federal investment tax credit (10 percent regular Federal credit, plus 15 percent Federal energy credit) and a 35 percent Arizona Commercial Solar Tax Credit. The letter also affirmed that the investors would be entitled to deduct the cost of the equipment over a 5-year period under the Accelerated Cost Recovery System. Also attached as an appendix to the prospectus was a five-unit, 13-year cash flow projection that assumed a yearly utility rate increase of 15 percent. To develop this projection, BFS Solar forecast an initial cash investment of $ 12,000 in 1983. [7] BFS Solar forecast revenue of $ 24 per month per unit, [8] increasing each year at a rate of 15 percent. Instead of assuming 6 months' rental revenues in the year of installation, 1984, BFS Solar simply cut the rental rate in half with the same net effect. BFS Solar calculated interest projections for the $ 12,000 promissory note at 9 percent, simple, on the unpaid principal balance. The projections applied 84 percent of lease revenues, *668 first to accrued and accumulated interest on the note and next to principal. If revenue was insufficient to cover accrued interest in a given year, the unpaid interest was accumulated but earned no further interest. BFS Solar forecast depreciation over 5 years, using the Accelerated Cost Recovery System and reducing the basis in the equipment by 12-1/2 percent in order to allow investors the full amount of the regular percentage and the energy percentage of the Federal investment tax credit. The projections assumed that investors would pay a 16 percent service fee for BFS' billing, collection, and administrative services. BFS Solar calculated the projected tax benefits attributable to losses flowing from the investment at a 50 percent rate. BFS Solar calculated the regular and energy percentages of the Federal investment tax credit at 10 percent and 15 percent, respectively, in 1983, the first year the systems were available for rent. Finally, BFS Solar calculated the Arizona Commercial Energy Credit at 35 percent of the system's cost and forecast it for 1983, the year of the system's installation. In the amendment to the prospectus, dated August 1, 1983, BFS Solar wrote of *669 its anticipation that all units sold after November 15, 1983, would be installed on homeowners' roofs in 1984. A unit had to be actually installed on a homeowner's roof before it became eligible for the Arizona credit. As a result, the investor would not receive a 35 percent Arizona Commercial Energy Credit in 1983, but, instead, would receive a 30 percent credit in 1984, the statutory rate for that year. At the time of the 1983 investment, the present value of the projected cash outflows by the investor, assuming an energy rate increase of 15 percent per year and a projected life of 13 years and using a discount rate of 15 percent, is $ 22,578.01. Ignoring all tax benefits except the Arizona Commercial Energy Credit, *670 the present value of the projected cash inflows from homeowner rental payments, assuming the same energy rate increase, using the same discount rate, and assuming no salvage value, is $ 19,925.25. Accordingly, the net present value of the 1983 project under these assumptions was a negative ($ 2,652.76) for the five units. Trobman's Income Analysis and Internal Rate of Return
In connection with the 1983 investment program, BFS Solar also gave investors or their advisors a copy of a document entitled "INCOME ANALYSIS AND INTERNAL RATE OF RETURN", which was prepared by Trobman. The document purported to be an analysis of the potential profitability of the Solon 240's taking varying levels of tax benefits into account. Trobman made several assumptions in developing the figures contained in the income analysis. He used a $ 35 per month energy rate figure to arrive at the homeowner's yearly cost for energy to heat enough water conventionally for his or her family at the rates charged by APS. [9] Trobman assumed that utility costs would generally increase at a rate of 15 percent with an additional 39 percent increase in year three (1985) attributable to a statement made by APS' *671 president that the construction of the Palo Verde nuclear plant would result in a 50 percent increase in energy rates. Trobman generally reduced the corresponding anticipated utility cost figure by 20 percent to arrive at the figure BFS Solar would charge the homeowner to rent a Solon 240. That is, BFS Solar would charge homeowners 80 percent of the rate APS was charging. *672 On the document analyzing the 1983 investment program, Trobman also made four different sets of projections: one using all tax benefits (credits and losses); one using only the Arizona solar energy credit, and Federal business energy and investment tax credits; one using just the Arizona solar energy credits; and one using no tax benefits. These projections are essentially meaningless. Petitioner could not recall whether or not he ever saw this particular document. Petitioner could only recall seeing something like this and could recall that he discussed something like this with Trobman. However, petitioner candidly testified that "there's no one in the world who believes ten year projections." Other than this discussion with Trobman about some projections, there is no indication that petitioner made any investigation of the 1983 sale-leaseback program beyond what he had done for the 1982 program. Essentially, petitioner relied upon his longtime friend and client, Trobman, who asked him to invest in the program. Subscription Agreement
For the 1983 investment program petitioner signed a document entitled "Subscription Agreement", dated December 30, 1983. This document *673 was an offer to purchase five Solon 240's at a unit price of $ 4,800 -- a total stated purchase price of $ 24,000, $ 12,000 of which was to be paid in cash. For the remaining $ 12,000, petitioner was to sign a 10-year, interest-bearing promissory note stated to be fully recourse. In conjunction with the offer, petitioner represented, in part, that he had received a copy of the 1983 investment program prospectus and was familiar with its contents; that he was an Arizona resident; that he had a net worth, excluding home, home furnishings, and personal automobiles, of at least $ 30,000 in excess of the subscription price; that he anticipated reporting at least $ 45,000 taxable income on his Arizona income tax return; and that he had sufficient knowledge and experience to understand the Federal and State income tax implications of the investment. Petitioner's 1983 Investment -- Promissory Notes
Petitioner made no cash payment to BFS Solar at the time he executed the subscription agreement. He signed several promissory notes in favor of BFS Solar at that time. The first note was a promissory note, dated December 30, 1983, in the amount of $ 6,000, due and payable to BFS Solar *674 on or before February 15, 1984. This note was stated to be recourse and provided for interest of 18 percent, only if petitioner had not paid its balance by the due date. In other words, interest would accrue on the note only after the due date and only if the principal had not been fully paid by the due date. The note provided that any lease of the collateral must provide for payment directly to BFS Solar. The second note was dated December 30, 1983, in the amount of $ 6,000, due and payable to BFS Solar on or before March 15, 1984. This note was stated to be recourse and provided for interest of 18 percent, only if petitioner had not paid its balance by the due date. The note provided that any lease of the collateral must provide for payment directly to BFS Solar. The third and final note was stated to be a recourse, 9-percent, simple-interest-bearing promissory note, dated December 30, 1983, in the amount of $ 12,000 due and payable to BFS Solar on or before December 30, 1993. The note referred to the contemporaneous Purchase Money Security Agreement and Assignment of Rents and repeated the provision therein that 84 percent of the gross income from leases of the equipment *675 would be applied to payments on the note. The note provided that lease income would be applied first to interest and then to principal. It further provided that if lease income was insufficient to cover interest accruals, any unpaid interest would be added to the next period's interest accruals. No other interim payments on the note were contemplated, although the unpaid balance and accrued interest were stated to remain due and payable at maturity. The note provided that any lease of the collateral would provide for payment directly to BFS Solar. Purchase Money Security Agreement and Assignment of Rents
In connection with the five Solon 240's, petitioner signed a document, also dated December 30, 1983, entitled Purchase Money Security Agreement and Assignment of Rents. This document provided BFS Solar a security interest in the equipment and any rents therefrom to assure payment of the $ 12,000 promissory note petitioner had given to BFS Solar. The document also assigned 84 percent of the gross receipts from the equipment to BFS Solar and provided that payment of all sums due from the equipment's lessees would be made directly to BFS Solar. The document gave BFS Solar *676 the right to accelerate all remaining payments in the event of a default and to sell the equipment and apply the proceeds toward the balance due on the notes. At this time petitioner also executed a Financing Statement -- Form UCC-1 -- establishing BFS Solar's security interest in the five Solon 240 units. Personal Property Lease
Petitioner (as lessor) signed a Personal Property Lease dated December 30, 1983, with BFS Solar (as lessee), for the lease of the five Solon 240's commencing on December 30, 1983, and continuing for 53 months. Payment under the lease had two components. The first component was base rent of $ 6,639, payable in 53 separate installments as follows: -- TOTAL MONTHLY RENTAL -- MONTHS
RENT PER UNIT
5 UNITS
01-12
$ 12.00
$60 13-24
24.00
120
25-36
27.60
138
37-48
31.80
159
49-53
36.60
183
The second component was 100 percent of all rents received from any sublease, less the base rent. The first lease payment was due on January 30, 1984, and each subsequent payment was due on the last day of each month thereafter. The lease stated that BFS Solar received the right to possess the equipment and to sublease it during the term of *677 the lease, but all other right, title, and interest was to remain with petitioner. The lease required BFS Solar to pay when due all assessments, sales, use, property, excise, and other taxes imposed on the equipment by any government, excluding any taxes on or measured by petitioner's net income. BFS Solar bore the risk of physical loss caused by damage, theft, or destruction of the equipment, and no such loss would impair BFS Solar's obligations under the lease. The lease required BFS Solar to bear all maintenance costs at its own expense. If BFS Solar defaulted under the lease, petitioner had the right to accelerate and to sue for all remaining payments. He had the right to demand a report of the location of the leased equipment, the names of any sublessees, and copies of any sublease agreements. The lease stated that neither BFS Solar nor petitioner intended its provisions to be a conditional sale agreement, chattel mortgage, or security agreement. As with the leaseback contract for the 1982 investment program, the effect of this lease was to make BFS Solar responsible for finding homeowner-lessees for the initial 53-month leaseback period. BFS Solar, however, was not expressly *678 obligated to sublease the Solon 240's. Management Services Agreement
Petitioner signed a Management Services Agreement, dated December 30, 1983, with BFS for the 1983 investment program. The duration of this Management Services Agreement was 10 years, and BFS was to receive compensation at the rate of 16 percent of gross monthly rentals actually received. In all other material respects, however, the 1983 Management Services Agreements were similar to the 1982 Management Services Agreements. BFS Solar Purchases Solon 240's for 1983 Investment Program
BFS Solar purchased and paid for an additional 155 Solon 240's from Amcor in 1983. These additional units came from the original shipment to Amcor's Phoenix warehouse in 1982. Homeowner Service and Lease Agreements
The equipment "leases" to homeowners, entitled "Homeowner Service and Lease Agreement for Solar Equipment", were for 2-year terms, and were drawn with NPS as the service provider. These agreements provided that homeowners would not be obligated to make monthly payments during the 2-year term. The agreements provided that once the initial 2-year lease terms expired, NPS would notify the homeowner *679 of its monthly service charge. Moreover, the homeowner could request the removal of the system at any time. The Homeowner Service Agreements required the homeowners to pay $ 600 for the cost of any installed parts that became a permanent part of the house. Homeowners had three options for paying the installation charge: 1) they could pay the $ 600 immediately; 2) they could pay it in three equal monthly installments; or 3) they could pay it with interest over a 24-month period. In 1984, BFS Solar leased to homeowners all of the 155 Solon 240 units involved in the 1983 program. The five Solon 240's involved in petitioner's 1983 investment were all leased and installed in 1984. In connection with the 1983 program, petitioner actually paid cash in the total amount of $ 12,000, but it is not clear whether that payment was made in April of 1984 or March of 1985. The record does not indicate that petitioner ever paid interest on any of the short-term promissory notes he signed, although the record is clear that he did not make the payments on those short-term notes by their due dates. Homeowner Lease Renewals
As the programs were set up, it was contemplated that if homeowners *680 under either leasing program did not renew their leases, the equipment would be removed from their homes. It was also contemplated that unless the equipment were relet to another homeowner, it would be placed in storage. Prior to 1987, BFS Solar maintained a warehouse for storage purposes, and any removed units would have been placed there. Thereafter, any removed units would have been placed in a warehouse of a firm that performed the installation work for the investment programs. Petitioner would not have taken physical delivery of units that were not relet. It was contemplated that homeowners could and would continue to lease the Solon 240's after the expiration of the initial 2-year, rent-free lease terms. It was apparently contemplated that if a homeowner chose to continue leasing, no new lease document would be necessary. BFS Solar under the name of NPS would simply send the homeowner a letter memorializing the homeowner's intent to continue using the equipment. Presumably, new leases would need to be executed only when an existing lessee sold the house to which the equipment was attached or when a lessee requested NPS to remove the equipment from the structure. For *681 most of the period before the Court, the homeowners would have still been in the 2-year, rent-free initial period, and only those units in the 1982 program that were installed in 1983 would have become subject to renewal in 1985. The record does not disclose the number of homeowners, if any, who chose to renew. The record does not disclose the number of homeowners, if any, who made rental payments for the use of the Solon 240 units. Petitioner never requested from BFS Solar the locations of the Solon 240's covered by his investments in the 1982 and 1983 programs. He never requested copies of agreements with the homeowners who used those Solon 240's. Petitioner relied on Trobman and BFS and did not make any independent efforts to determine whether they were living up to their obligations. Other than writing checks totaling $ 20,000 for the 1982 program and $ 12,000 for the 1983 program, petitioner never participated in the leasing activity in any way. At the time of trial, petitioner did not know whether any of the Solon 240's from either investment program were currently in use, nor did he know their location. BFS Solar Forfeits $ 100,000 Letter of Credit
BFS Solar *682 made no further Solon 240 purchases from Amcor because its leasing programs were not successful. Consequently, Amcor drew $ 100,000 in liquidated damages on the letter of credit BFS Solar had arranged for under the contract with Amcor. The total number of investors for the 1982 and 1983 investment programs was 26. At least three other members of petitioner's law firm also invested in BFS Solar's programs. Other than the initial installation fees paid by the homeowners, the record does not indicate whether any homeowners actually paid rent for the units after the expiration of the 2-year, rent-free period. The 1982-1983 Fair Market Value of the Solon 240
Retail prices for Amcor Solon 120, 170, and 240 models and comparable models of other manufacturers during the early 1980s ranged from as low as $ 2,500 to $ 3,000 for the smaller models to as high as $ 5,000 to $ 6,000 for the larger models. These are the prices to homeowners for a unit installed on the roof of the home. Retail prices for the Solon 240 would range from $ 3,000 to $ 5,670, but some of these published list prices also involved rebates in various amounts. In an article discussing passive solar water heaters *683 in the August 1983 edition of Solar Age, an industry publication, the Amcor Solon 120 was listed as selling for $ 3,500 to $ 4,500, installed. Trade or wholesale prices (prices dealers would pay Amcor) in 1982 and 1983, for the Solon 120, 170, and 240 were approximately $ 500, $ 650, and $ 1,000, respectively. During the early 1980s the solar industry was trying to create a demand, and dealers were free to charge whatever the market would bear. Dealers justified their very high markups by citing the heavy marketing expenses they incurred in creating a demand for solar water heaters. Transportation, damages, warehousing, advertising, heavy marketing expenses, installation costs, and profit are some of the expense factors that contributed to the wide difference between wholesale and retail prices for solar water heating equipment. In the early 1980s there was as yet no industry-wide standard markup from wholesale to retail price, but later a standard 40 percent markup developed. Vaughn's Analysis
At the time of trial Kenneth B. Vaughn had been a CPA for approximately 6 years and worked with the accounting firm of Toback and Co. in Phoenix, formerly Toback, Rubenstein, Feldman, *684 Murray & Freeman. In preparation for this litigation, Vaughn prepared a schedule which compared the cash outlay of an investor in the 1983 investment program with the present value of the income stream that the investor would receive from the program (adjusted for debt service). Vaughn compared the total cost for the five systems with the average rent for the initial 53-month leases, annualized. To prepare this schedule, Vaughn followed the tax shelter audit technique guidelines in the Internal Revenue Manual (IRM), which direct an agent to question a transaction when either the present value of the future income stream does not exceed the present value of the investment in the asset or the rate of return on the investment is less than the "risk free rate of return". For his calculations of the present value of the future income stream, Vaughn began with five units at a cost of $ 4,800 per unit for a total of $ 24,000. Vaughn assumed that each unit would have a $ 1,000 salvage value in 1995 and subtracted the present value of this salvage value from the amount initially invested. There is no evidence in the record that these units would have any salvage value in 1992, 1993, *685 or 1995. Vaughn relied on the "Cash Flow" projections contained in Trobman's Income Analysis and Internal Rate of Return to determine the present value of the estimated cash receipts. His use of Trobman's "Cash Flow" figures accounted for the $ 12,000 portion of the purchase price paid by note, because the "Debt Service" figures in Trobman's analysis had been subtracted from the "Base Rental" figure to arrive at the figure for "Cash Flow". In determining a discount rate, Vaughn varied from the IRM's direction to start with the prime rate. He used instead what he considered to be the risk-free rate, 9.12 percent. This was the rate earned on 90-day Treasury bills at that time (published in the Wall Street Journal). He then added an additional 2.28 percent to reflect the increased risk involved in the venture and concluded that the discount rate should be 11.4 percent. Using that discount rate, Vaughn concluded that the 1983 investment program passed the present value test even without the benefit of State or Federal tax credits. Vaughn's 11.4 percent discount rate was unreasonably low for a 12-year projection. For his calculations of the investment's rate of return, Vaughn included *686 only the base rentals and none of the excess rentals Trobman had projected. Again, the risk-free rate Vaughn chose for comparison was the 9.12 percent rate earned on 90-day Treasury bills at the time. Vaughn concluded that the 1983 leasing program failed the rate of return test without State or Federal tax credits factored in, but he concluded that it passed the rate of return test with only the State credit factored in. Respondent's Expert
Respondent's expert, Andrew Schon, of Xenergy, Inc., of Burlington, Massachusetts, has an impressive professional background and significant experience in the economic and financial aspects of solar energy and the valuation of solar equipment. Schon determined the fair market value of an Amcor Solon 240 using several different methods. Since there existed an active market for the type of equipment to be valued, Schon felt that the best way to determine the equipment's fair market value was the competitive valuation method, i.e., to look at the trade (wholesale) price of equivalent pieces of equipment. Amcor itself had quoted trade prices of $ 1,050 to $ 1,100. Schon took the average of the two Amcor quotes, $ 1,075, as the best indication *687 of the equipment's value in the market. Schon also used other methods to value the equipment. One of these methods focused on the value of the component parts of the Solon 240. Using this method Schon arrived at a value of $ 814 for the Solon 240. Another method focused on the equipment's trade value at the time Schon wrote his report, $ 1,318. Schon assumed that an individual, such as petitioner, could obtain the wholesale or trade price for as few as five Solon 240 units. However, if petitioner could have purchased five Solon 240 units for $ 1,075 each, that price would have been f.o.b. Amcor's California warehouse. The final two methods focused on the homeowner's savings and the investor's income stream from the equipment. Focusing on the homeowner's savings, Schon arrived at a trade price of $ 1,899 for each Solon 240. In arriving at his income-based valuation from the homeowner's perspective, Schon had to determine the dollar amount of electric energy savings solar water heating would provide. He used a computer program called F-Chart which is the industry standard method for simulating solar water heating equipment's capability. Schon used all the characteristics *688 of the Amcor Solon 240 to model it and determine its performance in Phoenix, Tucson, and other Arizona cities. Schon derived from this information a solar fraction, i.e., the percentage of the homeowner's total hot water usage that the Amcor Solon 240 would provide. Schon found that the solar fraction for the Solon 240 was approximately 73 percent. This figure would depend on family size, [10] and Schon assumed a family size of four people using 20 gallons of hot water per person per day. Schon took the 20 gallon per person per day estimate from the Arizona Solar Energy Commission publication "Solar Water Heating for Arizona Homes". Schon used a 20 percent discount rate to determine the present value of the net savings stream to the homeowner. In choosing this discount rate Schon relied on energy tax credit studies by Professor Houseman at the Massachusetts Institute of Technology who found that the expected *689 return on investment in credit-eligible equipment was inversely related to the homeowner's income, i.e., the greater the amount of money available to invest, the less concerned the homeowner was with the risk involved; and the less the amount of money available to invest, the more concerned the homeowner was with the amount of risk involved. According to this study, despite facing the same risk, relatively wealthier people do not expect to receive as high a rate of return as relatively poorer people expect. Houseman had concluded that the wealthiest homeowners would expect a 15 percent rate of return on their investment and the poorest homeowners would expect a 60 percent rate of return. Schon assumed that the middle-income homeowners Trobman had targeted were not as wealthy as the wealthier homeowners in Houseman's study, so he picked a discount rate slightly higher than the 15 percent rate Houseman's wealthier homeowners would expect. After Schon determined the present value of the investment's income stream ($ 791.55) without factoring in the tax credit, he had to factor in the credit to determine the amount a reasonable homeowner would be willing to pay for it. Schon thought *690 that the various credits amounted to 75 percent of the amount ultimately paid for the investment, and therefore concluded that a reasonable homeowner would be willing to pay up to four times the present value of the income stream, or $ 3,166. [11]
Schon's final method addressed the investor's income stream. Focusing on the investor's income stream, Schon arrived at a unit price of $ 1,152, assuming that the equipment could be financed over a 15-year useful life. Schon also used the income stream valuation method from the investor's point of view over the 10-year period of the $ 12,000 promissory note and arrived at a unit price of $ 817. The following charts in Schon's report detail Schon's valuations using the income stream method from the investor's point of view: Income Stream Valuation *691 (Investor's Perspective, 15 years) December 1983 lot of 5 systems 1
2
3
4
Year
Initial
Income
Mngmnt
Payment
from
Fee
Rentals
(16 percent)
0 1983
12,000
1 1984
720
115
2 1985
1,440
230
3 1986
1,656
265
4 1987
1,908
305
5 1988
*
1,586
254
6 1989
*
1,246
199
7 1990
*
1,349
216
8 1991
*
1,461
234
9 1992
*
1,582
253
10
1993
*
1,713
274
11
1994
*,+
1,855
297
12
1995
*
2,008
321
13
1996
*
2,175
348
14
1997
*
2,354
377
15
1998
*
2,549
408
SUM
25,602
4,096
5
6
7
8
Net
Loan
Unpaid
Principal
Income
Payments
Interest
Balance
Accrual
0 12,000
1 605
605
475
12,000
2 1,210
1,210
346
12,000
3 1,391
1,391
35
12,000
4 1,603
1,603
0
11,477
5 1,332
1,332
0
11,178
6 1,046
1,046
0
11,138
7 1,133
1,133
0
11,007
8 1,227
1,227
0
10,770
9 1,329
1,329
0
10,411
10
1,439
1,439
0
9,909
11
1,558
1,558
0
9,242
12
1,687
1,687
0
8,387
13
1,827
1,827
0
7,315
14
1,978
1,978
0
5,996
15
2,141
2,141
0
4,394
21,506
21,506 $ 4,394 still owed
*692 NPV at 20 percent $ 5,762 Unit Price (Investor based) $ 1,152 NPV of Investor's Net Cash Stream at 20 percent Discount Rate ($ 12,185)
Income Stream Valuation (Investor's Perspective, 10 years) December 1983 lot of 5 Systems 1
2
3
4
Year
Initial
Income
Mngmnt
Payment
from
Fee
Rentals
(16 percent)
0 1983
12,000
1 1984
720
115
2 1985
1,440
230
3 1986
1,656
265
4 1987
1,908
305
5 1988
* 1,586
254
6 1989
* 1,246
199
7 1990
* 1,349
216
8 1991
* 1,461
234
9 1992
* 1,582
253
10
1993
* 1,713
274
SUM
14,661
2,346
5
6
7
8
Net
Loan
Unpaid
Principal
Income
Payments
Interest
Balance
Accrual
0 12,000
1 605
605
475
12,000
2 1,210
1,210
346
12,000
3 1,391
1,391
35
12,000
4 1,603
1,603
0
11,477
5 1,332
1,332
0
11,178
6 1,046
1,046
0
11,138
7 1,133
1,133
0
11,007
8 1,227
1,227
0
10,770
9 1,329
1,329
0
10,411
10
1,439
1,439
0
9,909
12,315
12,315
$ 9,909 still owed
*693 NPV at 20.0 percent 4,083 Unit Price (Investor based 817 NPV of Investor's Net Cash Stream at 20 percent Discount Rate ($ 13,600)
To develop the 15-year projection, Schon had to assume that an investor would be able to refinance (on the same terms) the balance of the note remaining unpaid after year 10 for the remainder of the equipment's useful life. If the investor could not refinance the 10-year promissory note, the 15-year projection would be meaningless. The terms in the prospectus for the 1983 investment program essentially called for $ 12,000 down and a $ 12,000, 10-year promissory note bearing 9 percent simple interest. The investor's revenue from the leasing program after payment of BFS' 16 percent management fee would be applied to interest first and then to principal. If the investor's revenue were insufficient to pay a given year's interest accrual, the unpaid interest would be carried over to the following year, but no interest would accrue on the interest carried over. In addition, BFS guaranteed rentals to the investor only for the first 53 months. For 1984, investors received only 6 months' guaranteed rent, or $ 720, computed on a base revenue figure of $ *694 1,440. For 1985, investors would receive the full base revenue, or $ 1,440, and for 1986, 1987, and part of 1988, the revenue figures reflect a 15 percent per year increase in energy costs. The 53-month term of the lease to BFS Solar ends midway through 1988, and at that time the guaranteed payments to the investors end. At this point any revenue to the investors is tied directly to any rental payments from homeowners. Shared savings programs are typical in the solar energy industry and usually split the homeowner's energy cost savings in half. Schon felt that 75 percent to the service provider was the highest split a homeowner would agree to and that any higher split would not give the homeowner adequate savings to economically recoup his installation costs. At the end of the 15 years the principal balance still owing on the note would be $ 4,394. Schon made an assumption in reaching the $ 4,394 balance remaining on the promissory note after 15 years. He looked at the 1982 United States Department of Energy (DOE) rate forecasts in an effort to determine an average annual rate increase for the 15-year period. DOE forecast a 2.0 percent average residential rate increase to *695 which Schon added the 6.2 percent 1982 rate of inflation to arrive at 8.2 percent. The local utility, APS, also predicted an 8.2 percent rate increase. [12] Schon recognized the potential rate increase when Palo Verde was brought on line in 1985, but ignored it because it was a short-term anomaly in a long-term analysis. To determine the present value of the income stream of five Solon 240's, Schon discounted the yearly net income figures (yearly income from rentals minus BFS' 16 percent management fee) using a 20 percent discount rate. Schon based this 20 percent discount rate on the following *696 factors. He chose the 15-year United States Government Bond yield (published in the Wall Street Journal) as his risk-free rate and then added to that a risk premium. In 1983 the 15-year Government Bond Rate was 11 percent. At that time, Atlantic Richfield Co. (ARCO) and Mobil Oil Co. (Mobil) were both involved in the solar industry and had 16-percent interest rates on their commercial paper. The 1982 and 1983 solar water heater investment programs had to be riskier than the ARCO and Mobil commercial paper, because they were not being operated within the confines of an established company such as ARCO and Mobil. Schon added a 9 percent risk premium based on BFS Solar's lack of experience, the uncertainty over the future of electric rates, the length of the investment, and the investors' lack of control over the equipment. Using the 20 percent discount rate, Schon determined that the present value of the income stream over the useful life of the five Solon 240's was $ 5,762. The present value of the income stream over the useful life of one Solon 240 (or, put another way, the value of each Solon 240 using the income stream method from the investor's perspective) was $ 1,152. *697 Next, Schon determined the present value of the entire investment by taking into account the $ 12,000 initial down payment, canceling out the discounted net income and discounted loan payment figures, and discounting to present value the $ 4,394 balance of the note remaining unpaid after 15 years. Schon arrived at a present value of negative ($ 12,285) for the investment. Schon's analysis shows that no prudent investor would enter in the leasing programs apart from the potential tax benefits. The results of this 15-year projection are more favorable to the investor than the results of the 10-year projection due to the further payment of principal during the additional 5 years. Petitioners' 1983, 1984, and 1985 Tax Returns
On a Schedule C attached to their 1983 income tax return, petitioners reported rental receipts from BFS Solar in the amount of $ 1,040 and deducted depreciation in the amount of $ 14,160 attributable to the BFS Solar programs. Petitioners also claimed $ 9,922 in investment tax credits ($ 6,322 for regular investment credit and $ 3,600 for business energy investment credit). On the Schedule C attached to their 1984 income tax return, petitioners apparently *698 reported no income from solar unit rentals and deducted depreciation in the amount of $ 15,360 attributable to the BFS Solar programs. On the Schedule C attached to their 1985 income tax return, petitioners apparently reported no income from solar unit rentals and deducted depreciation in the amount of $ 15,120 attributable to the BFS Solar programs. Respondent's Statutory Notice
On April 3, 1987, respondent mailed to petitioners a statutory notice of deficiency for 1983, 1984, and 1985. Essentially, respondent disallowed the depreciation deductions and tax credits attributable to the solar water heater units. Respondent also determined additions to tax for negligence and valuation overstatements and increased interest for a tax-motivated transaction. ULTIMATE FINDINGS OF FACT 1. The benefits and burdens of ownership of the Amcor Solon 240 units were not transferred to petitioner. 2. The sale-leaseback transactions had no practical economic effect or economic substance other than tax benefits. OPINION Petitioner claimed deductions for depreciation, the investment tax credit, and the energy tax credit on his Federal income tax returns for the years at issue. Whether *699 these deductions and credits are proper depends upon whether petitioner used the solar water heating equipment in a trade or business (section 162(a)) or held the equipment for the production of income (section 212). Section 167(a) provides as a general rule -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business, or (2) of property held for the production of income. Section 46(a) (1) and (2) determines the amount of the investment tax credit and energy credit for purposes of section 38. In order to be property to which the section 38 credit is applicable (i.e., "section 38 property"), it must be "property with respect to which depreciation * * * is allowable and having a useful life * * * of 3 years or more." Sec. 48(a). Thus, petitioner must prove that the transactions at issue satisfy the requirements of section 162(a) or section 212 as a threshold for claiming the above tax benefits. "Otherwise, no credits are allowed, and deductions may be allowed only to the extent there is income from the activity." Soriano v. Commissioner, 90 T.C. 44, 52-53 (1988); *700 Sec. 183. In Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978), the Supreme Court considered a sale-leaseback transaction and held that: where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. The Ninth Circuit, to which this case is appealable, does not view this holding as necessarily requiring rigid adherence to a two-part test, consisting of a subjective "business purpose" test and an objective "economic substance" test. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628, affg. in part, revg. and remanding in part Larsen v. Commissioner, 89 T.C. 1229 (1987), affg. Moore v. Commissioner, T.C. Memo. 1987-626, and affg. Sturm v. Commissioner, T.C. Memo. 1987-625.
*701 Instead, the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses. Casebeer v. Commissioner, supra at 1363; Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985). Our first inquiry is whether the sale-leaseback transactions were so lacking in economic substance as to preclude a finding that the benefits and burdens of ownership passed to petitioner. Cherin v. Commissioner, 89 T.C. 986, 992 (1987). In effect, we are looking at whether petitioner actually purchased solar water heating units or whether he merely purchased a package of tax benefits. Petitioner claims that he was a sophisticated investor, that he examined the economic projections of the investment, and that he seriously evaluated the offering materials. The record shows otherwise. Petitioner's prior investments, *702 moreover, consisted primarily of real estate and construction equipment leasing activities. He had no experience in owning or leasing solar water heating equipment. We think these types of investments are sufficiently dissimilar that petitioner was not a "sophisticated investor" insofar as the transactions at issue here are concerned. See Herrick v. Commissioner, 85 T.C. 237, 256 (1985) ("We do not think * * * that petitioner's experience in selling * * * real estate or oil and gas ventures translated into expertise in the automotive parts marketing business."). There is no evidence that petitioner ever consulted anyone who was knowledgeable about solar water heaters or about the economics of a leasing transaction involving such units. Petitioner failed to conduct an independent examination of any electric rate forecasts, whether contained in the Placement Memorandum, the Prospectus, Trobman's own projections, or otherwise. Clearly, the reasonableness of these forecasts is key to evaluating the potential profitability of the ventures. Petitioner sought advice from Villanueva, his accountant, concerning the economic profitability of the transactions. *703 There is no evidence, however, that Villanueva had any expertise in evaluating solar water heating investments. Moreover, the record before us does not indicate what Villanueva's evaluation was. "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Petitioner's profit objective "must be determined by a careful analysis of all the surrounding objective facts, and greater weight is given to such facts than to his mere statement of intent." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While petitioner testified that he thought he would make a profit, he had no basis for that belief. Essentially, he relied on his longtime personal friend and client, Trobman, who asked him to invest in the deal. "While petitioner's testimony as to his *704 nontax motives is entitled to some credibility, we place greater weight on objective facts." Cherin v. Commissioner, supra at 992; Dreicer v. Commissioner, supra at 645. We have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance. The economic substance of a business transaction and the intent, purpose, or motive of an individual investor, while sometimes equated, are not identical. * * * Subjective intent cannot supply economic substance to a transaction. * * * Cherin v. Commissioner, 89 T.C. at 993-994 (footnote omitted). In determining whether the transactions at issue had economic substance, we look at "whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction." Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23. A realistic *705 potential for profit is found "when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment." Cherin v. Commissioner, supra at 994. "Profit" in this instance refers to economic profit apart from tax benefits. Soriano v. Commissioner, 90 T.C. at 53 (quoting Beck v. Commissioner, 85 T.C. 557, 570 (1985)). Here, apart from tax benefits, there was no realistic potential for any profit. We reach that conclusion on the record as a whole, on the testimony of respondent's expert, and on the Court's own cash flow analyses discussed below. A. Cash Flow Analysis
Because the transactions in the present case involve leasing, fair market value of the energy-management devices is not, in and of itself, a good indicator of the economic feasibility of the project. However, the cash-flow analysis applied herein to judge profitability essentially determines the fair market value of the leases. Further, we must consider the economic *706 reality of the entire transaction. Soriano v. Commissioner, supra at 54. 1. Projected cash expenditures For the 1982 program, the projected cash expenditure was $ 14,000 for five units, i.e., $ 2,800 cash per unit. [13] For the 1983 program, the projected cash expenditure was $ 12,000 for five units. 2. Utility costs Because the Amcor Solon 240 system was marketed to, i.e., intended to be rented to, families of six to eight persons, we will analyze the transaction on the assumption that the average lessee of *707 the Amcor Solon 240 was a family of six using 120 gallons of water per day. Both Trobman and Schon, respondent's expert, used a family of four in their various projections. Schon used $ 0.0584 as the 1982 cost of one kilowatt hour (kWh) of electricity. Schon cites a conversation with Roger Kidd of the Rate Administration of Arizona Public Service as the source of this information. In the absence of evidence to the contrary, we will accept respondent's energy cost as correct. Schon calculated the required energy to heat 80 gallons of water a day at 17.08 million Btu (MMBtu), or 5004.44 kWh per year. Since we have determined that the proper analysis takes into account a family of six rather than four, we note that the energy required to heat 120 gallons of water per day is 25.62 MMBtu per year. Since there are 293 kWh per one million Btu, 7506.66 kWh per year are required for 120 gallons of water per day. The solar fraction for 120 gallons per day in Phoenix is 60 percent. Thus, the amount of energy saved by solar heating is 60 percent of 7506.66 kWh per year, or 4504 kWh per year. The rental income projections in the 1982 Placement Memorandum and in Trobman's projections for *708 the 1983 program, upon which Vaughn (petitioner's accounting witness) relied, were based on a percentage of projected total energy costs per year. In other words, those projected rental income figures represented 80 percent of total energy costs per year, rather than a percentage of the savings from using a solar water heater. An amount of 80 percent of total energy costs could well exceed the total amount saved by using a solar water heater. In his 15-year analysis, respondent's expert assumed homeowner maintenance costs of $ 9 per year, with a 5 percent increase in the last ten years. Because this figure has a minimal, if any, effect on the result, we will ignore maintenance costs in our calculations. Also, BFS Solar bore all of the maintenance costs on the units, not the investors. 3. Useful life Useful life is defined in section 1.167(a)-1(b) of the Income Tax Regulations as follows: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production *709 of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change *710 in the useful life is significant and there is a clear and convincing basis for the redetermination. * * * We initially note that, by virtue of the first sentence of this regulation, an asset has a useful life for tax purposes only if the taxpayer holds the property in a trade or business or for the production of income. For the sole purpose of the discussion of useful life, infra, we assume that petitioner herein was either in the trade or business of leasing solar heating equipment or that he held the equipment for the production of income. Petitioner's accounting witness, Vaughn, assumed a useful life for the solar heating equipment of 12 years. Vaughn did not say why he was using a 12-year life and nothing in the record indicates why he would assume a 12-year life. Respondent's expert, Schon, performed two analyses -- one which assumed a 15-year life and another which assumed a 10-year life. With respect to the analysis involving the 15-year assumption, Schon's report stated, "The equipment, with proper maintenance, is assumed to have a useful life of 15 years without major system replacement. Note that hot water tanks typically carry a 10-year guarantee." At trial, *711 Schon testified that 15 years was "what we perceived to be the useful life of the equipment." Schon also performed an analysis over 10 years because this was the term for the long-term notes. Schon also concluded that the salvage value of the equipment after 10 years was essentially zero. The Amcor Solon 240 units involved in this case were warranted for only 5 years. The booklet that BFS Solar compiled for investors stated only that information from the manufacturer indicated an expected 15-year useful life. Whatever information BFS Solar may have received from Amcor is not in the record. The tax opinion contained in that same booklet, however, stated that "the useful life of this property is represented to be at least nine years, which is also the upper end of the guideline life assigned to such property by the [Internal Revenue] Service." We are not bound by opinion evidence that is contrary to the judgment of the Court. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Goldstein v. Commissioner, 298 F.2d 562, 567 (9th Cir. 1962), affg. T.C. Memo. 1960-276. *712 Neither Vaughn nor Schon had a well-reasoned basis for choosing a 12-year or 15-year useful life for the equipment. We note that the determination of the useful life of the equipment must take into account the possibility of obsolescence. "Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition." Sec. 1.167(a)-9, Income Tax Regs. In light of the above, nothing in the record persuades us that the useful life for the Amcor 240 units was any greater than 10 years. "Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer." Sec. 1.167(a)-1(c)(1), Income Tax Regs. Vaughn assumed the salvage value of the equipment to be $ 1,000 at the end of 12 years. Schon determined a salvage value of zero after 10 years, giving particular regard to the climate and wide temperature changes in the Phoenix area. Petitioner has presented no evidence that would cast doubt on Schon's determination. Stated another *713 way, there is no evidence in the record to show that the Amcor Solon 240 units would have any remaining residual value at the end of 10 years. We find Schon's determination to be reasonable, and we find that the equipment would have no salvage value at the end of 10 years. 4. Anticipated savings Using the 60-percent solar fraction for 120 gallons of hot water per day in Phoenix, we assume that the end-users (homeowners) would save 60 percent of the cost of their annual electric energy bills. We further assume that the end-users will be willing to pay rent amounting to 75 percent of their energy savings, although we agree with respondent's expert that this figure is an optimistic estimate. By the same token, the pro forma projections in the Placement Memorandum for the 1982 leasing program assumed rents of 80 percent of total energy costs, and indicated that the base period rental income was "approximately 90% of current electrical rates." BFS Solar's projections in the Prospectus for 1983 simply increased the base rental by 15 percent each year after the 53-month rental period. Trobman's projections for the 1983 program assumed rent amounting to 80 percent of total energy *714 costs after the base rental period. 5. Energy inflation In his present value analysis, Vaughn relied on Trobman's projections of estimated rental receipts. Trobman's projections assumed an annual rate increase in energy costs of 15 percent per year for 1983 through 1995. The increase between 1984 and 1985, however, was projected by him to be an additional 39 percent (for a total increase over the prior year of 54 percent) due to the Palo Verde nuclear power plant going on line. This amounted to a projected rate increase averaging 20 percent per year over a 13-year period, which is wholly unreasonable. Vaughn performed no independent analyses of these projections. Schon used an 8.2 percent increase in energy rates per year. Schon used the 1982 Department of Energy forecasts for electric energy cost rises in the residential sector, which was 2 percent, and added to this an inflation factor of 6.2 percent, to arrive at an energy cost growth of 8.2 percent. Petitioner has failed to carry his burden of proof on this issue. Rule 142(a). We find that 8.2 percent is a reasonable assumption of the increase in energy costs. 6. Discount rate Petitioner's accounting witness, *715 Vaughn, used a discount rate of 11.4 percent. Respondent's expert witness, Schon, used a discount rate of 20 percent. Vaughn attempted to rely on the IRS Audit Guidelines (the Guidelines) in his present value analysis. The Guidelines state that "the true fair market value of a leased asset can generally be measured by the present value of the future income stream." In determining this present value, one must first determine the assumed interest rate, or discount rate. The Guidelines advise that "The assumed interest rate should generally be based on the prime rate, adjusted to reflect the risk involved in the investment." The prime rate was 11 percent in December 1983. The 15-year Government bond rate in 1983 was also 11 percent. Vaughn stated that his discount rate of 11.4 percent was "based on a risk free rate with a premium added * * * which turns out to be a little over the prime rate." Vaughn used the December 30, 1983, 90-day T-bill rate of 9.12 percent as his risk-free rate. He then adjusted that rate by 2.28 percent to account for additional risk in the investment. At trial, Vaughn stated that "There's no specific guideline as to how to make that adjustment. I believe *716 it's a judgment call." This Court is well aware that the lower the discount rate used in the present value analysis the higher the present value of the investment will be. Vaughn's choice of the 90-day T-bill rate as the risk-free rate for a 12- or 15-year analysis is too low and seriously flawed. It was clearly unreasonable to use a discount rate which approximates the prime rate, when the prime rate should be the beginning point to which an upward adjustment for risk is added. Also, Vaughn's adjustment for risk was too low. Respondent's expert, on the other hand, used a discount rate of 20 percent. In determining the proper rate to use, Schon began with the 15-year yield on Government bonds, which was 11 percent, and then added to that "a risk premium for investments of this type." At trial, Schon explained that "typically the way risk free rates of Government bonds are used * * * [is] an investment is assumed as a transformation of cash into an asset, and the risk free rate should have an equivalent life of that asset." Schon added to the risk-free rate a 9 percent risk premium which he believed was "typical for investments of assets not associated with a company." Schon *717 indicated that investments with a company would carry a lower risk premium of perhaps 5 percent. As a comparison, Schon looked at the commercial paper rates for Mobil and ARCO, which were around 16 percent. Schon, concluded that the solar water heater investment would be more risky than such commercial paper. We agree. In general, we find Schon's method of determining a discount rate to be more sound than the determination made by Vaughn. Schon, however, performed two analyses -- one utilizing a 15-year useful life and one utilizing a 10-year useful life. In doing so, he failed to heed his own advice of beginning with a risk-free rate which has an equivalent life to that of the equipment. In performing both analyses, Schon used the same discount rate of 20 percent. We have determined the useful life of the solar water heating equipment to be 10 years and not 15. Thus, to verify the economics of the program over a 10-year period and to assure that the discount rate does not skew the results, we conclude that the 20 percent discount rate is perhaps too high. We will consider the appropriate discount rate to be 17 percent (11 percent prime rate with a 6 percent risk premium). *718 Since this risk premium is just slightly above that for an established company and since the total 17 percent is just slightly above the ARCO and Mobil commercial paper rate, it should be a conservative or minimum discount rate to apply. Applying the above assumptions, and assuming transactions involving five units in both 1982 and 1983, we conclude that the net present value of the 1982 transaction is negative ($ 6,457) and that the net present value of the 1983 transaction is negative ($ 6,300). We have excluded from these computations all Federal tax benefits, but we have not excluded the Arizona commercial tax credits. [14] See Appendices I and II attached to this opinion for the detailed computations. Neither transaction made economic sense without first taking into account Federal tax benefits. There was no reasonable possibility of profit in either the 1982 program or the 1983 program aside from Federal tax benefits. In both instances, petitioner purchased a package of tax benefits. He did not purchase solar heating equipment. *719 Aside from the fact that the sale-leaseback transactions had no realistic prospect for economic profit apart from tax benefits, other factors also confirm our view that petitioner purchased tax benefits rather than solar water heater units. Other than claimed tax benefits, petitioner never had any of the benefits or burdens of ownership. BFS Solar had possession of the solar units. BFS Solar was required to pay all assessments, sales, use, property, or other taxes imposed on the equipment by any government. BFS Solar bore the risk of physical loss caused by damage, theft, or destruction of the equipment, and any such loss would not impair BFS Solar's obligations to the investors. BFS Solar had to bear all maintenance costs at its own expense. During the 53-month leaseback period, BFS Solar had no obligation to sublease the units to homeowners. When BFS Solar did lease units to homeowners, they were leased rent-free for the first 2 years. Other than the investors' cash payments and any installation fees paid by homeowners, the transaction generated no income during the first 2 years. The record does not indicatewhether any rental income was ever generated. In any event, *720 the guaranteed base rents were just an accounting entry at best. When BFS Solar's leasing programs proved to be unsuccessful, which seems to have occurred rather early on, the whole operation seems to have simply faded away. Significantly, however, petitioner never tried to obtain possession of any of the solar water heater units he allegedly owned. At the trial, petitioner did not know how many, if any, of "his" units were still rented to homeowners. He did not know where "his" units were physically located. Trobman vaguely suggested that any units removed from a homeowner's roof and not relet to another homeowner would be placed in storage. However, Trobman, BFS, and BFS Solar did not have any such storage space at the time, and Trobman suggested that the units would be stored with the unrelated company that had performed installation services for BFS Solar. What was crystal clear, however, was that the units would not be, and had not been, returned to petitioner. Both petitioner and Trobman displayed an amazing lack of concern about these units. While these later events are merely confirmatory of, and not the basis for, our conclusion that the transactions lacked economic *721 substance, we think they warrant mention. These later events also highlight a significant void in petitioner's evidence, petitioner's failure to establish that the solar units would have any remaining residual value at the end of 10 years. On the record as a whole, the Court cannot find that petitioner purchased any Amcor Solon 240 units. B. Amount at Risk There remains, of course, the matter of the long-term promissory notes for the remaining one-half of the stated purchase price. Those notes are stated to be recourse. The principal of the notes and any interest thereon presumably were to be paid out of the 84 or 85 percent of the gross rental receipts from the homeowners or were to become due and payable at the end of the 10-year period. If petitioner owned these units and if he really regarded himself as obligated to pay those notes, the Court is satisfied that he would not have been as indifferent to the units and their whereabouts as he was at the trial. There is nothing in the record that persuades the Court that Trobman or BFS Solar intended to enforce the notes, or that petitioner believed they would ever attempt to do so. The Court is satisfied that the promissory *722 notes were just so much window dressing designed to give verisimilitude to a purported purchase of solar water heating equipment that did not in fact occur. Section 465 provides: (a) Limitation to Amount at Risk. -- (1) In General. -- In the case of -- (A) an individual, * * * * * * engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year. * * * (b) Amounts Considered at Risk. -- (1) In General. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) Borrowed Amounts. -- For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment *723 of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1). * * * (4) Exception. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. "The presence of deferred debt that is in substance or in fact not likely to be paid is an indicia of lack of or exaggeration of economic substance. * * * On the other hand, bona fide third-party debt may indicate that a transaction, or at least part of it, should be recognized." Rose v. Commissioner, 88 T.C. 386, 419-420 (1987), affd. 868 F.2d 851 (6th Cir. 1989) (citations omitted; emphasis added). In the present case the record as a whole indicates that the purportedly *724 recourse promissory notes were not bona fide indebtedness. We are fully aware of the long line of decisions of this Court and other courts that have dealt with bona fide long-term recourse notes assumed by limited partners. In those cases, the courts have given credence to recourse notes as a basis for supporting claimed losses or establishing section 465 "at risk" amounts. See, e.g., Pritchett v. Commissioner, 827 F.2d 644 (9th Cir. 1987), revg. and remanding 85 T.C. 580 (1985) (at risk under sec. 465); Follender v. Commissioner, 89 T.C. 943 (1987) (at risk under sec. 465; partnership's basis); Melvin v. Commissioner, 88 T.C. 63, 75 (1987) (at risk under sec. 465); Abramson v. Commissioner, 86 T.C. 360 (1986) (partnership's basis; at risk under sec. 465). In all of those cases, however, the recourse notes were given to independent third parties whose interests did not necessarily coincide with those of the note makers. Those cases did not involve, as does the instant case, transactions between two organizations created to carry *725 out a tax shelter scheme, notes given for amounts having no relationship to economic reality, or notes which almost certainly would not be paid. See Goldstein v. Commissioner, 364 F.2d 734, 740-741 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Durkin v. Commissioner, 87 T.C. 1329, 1376-1377 (1986); Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Houchins v. Commissioner, 79 T.C. 570, 589-590 (1982). Ferrell v. Commissioner, 90 T.C. 1154, 1186 (1988). We hold that the purportedly recourse notes in this case were merely a device for investors to obtain the tax benefits referred to in the offering materials. BFS Solar, petitioner's creditor, was not an independent third party but was an essential party to the sale-leaseback arrangement. See Ferrell v. Commissioner, supra at 1186. Petitioner has not met his burden of proof with respect to these notes. Petitioner did not know which units, if any, were in *726 use. Petitioner had very little knowledge about the status of these transactions at the time of trial. This in itself belies petitioner's position that he had purchased solar water heater units, that his units were being used in a trade or business or being held for production of income, and that he was obligated to pay the remaining balance of the stated purchase price for the units. In Bussing v. Commissioner, 88 T.C. 449, 458 (1987), we held, in the context of a valid sale-leaseback transaction, that the taxpayer's obligation did not represent valid indebtedness. The transaction at issue is not a genuine multiple-party transaction, but a purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties. * * * Although Bussing was supposed to earn a net cash-flow of $ 533 per year pursuant to the purchase and lease agreements involved, * * * neither party made or received any payments with respect to the transaction subsequent to the cash down payment by Bussing. The respective obligations between AG [the original owner] and Bussing cancel each other out. Any possible claim by AG with respect *727 to the note is fully offset by AG's rental obligation to Bussing. * * * Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve. Bussing v. Commissioner, supra at 458. See also Supplemental Opinion 89 T.C. 1050, 1056-1058 (1987). The payment schedule in the present case is similar to that in Bussing. Here, all of the payments for the purportedly recourse loans were to be made from 85 (or 84) percent of the rental proceeds received from the homeowners. The remaining 15 (or 16) percent of the lease revenues went directly to BFS or BFS Solar for its "management fee". With the exception of some lucrative tax benefits, petitioner, in effect, received no pecuniary benefit from the transactions. The purportedly recourse notes were simply pieces of paper drawn up to support these tax benefits. BFS Solar was not expressly obligated to sublease the Solon 240's either during the initial 53-month lease period or thereafter. As noted earlier, at the time of the trial, petitioner did not know where the equipment *728 was or what equipment was in use. Accordingly, we cannot find that the notes represented valid indebtedness. Petitioner was not at risk, within the meaning of section 465, for these amounts. C. Additions to Tax and Increased Interest
1. Section 6653(a)(1) and (2) Section 6653(a)(1) provides for the addition of 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an additional amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or the intentional disregard of rules and regulations. Negligence is the lack of due care or failure to do that which a reasonable and prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Respondent's determination of negligence is presumed correct, and petitioner bears the burden of proving otherwise. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. *729 Petitioner has failed to show that he adequately investigated the financial viability of the equipment leasing transactions. See LaVerne v. Commissioner, 94 T.C. 637 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992). Based on the entire record, we are satisfied that petitioner was essentially unconcerned about the economics of the transactions, because of the tax benefits. He knew or should have known that he was buying a package of tax benefits and not solar water heater units. Thus, we sustain respondent's determination as to the additions under section 6653(a)(1) and (2). 2. Section 6659 Section 6659 provides for an addition to tax if the underpayment of tax is attributable to a valuation overstatement. Sec. 6659(a). Because we have concluded that the purportedly recourse notes were not bona fide indebtedness, we find that at most the value of the Solon 240 units did not exceed petitioner's cash investment. For the 1982 program, the value of each unit at most would *730 have been $ 2,000 ($ 20,000 divided by 10 units), and for the 1983 program, the value would have been at most $ 2,400 ($ 12,000 divided by 5 units). Based on our analyses in Appendix I and Appendix II, infra, it is clear that the value of the interest that petitioner acquired in each unit was worth much less than $ 2,000 or $ 2,400. In both programs, petitioner valued each unit at $ 4,800, and because we have concluded that petitioner did not purchase solar water heaters, the entire amount is a valution overstatement. [15] Pursuant to section 6659(b), petitioner is liable for an additional 10 percent of the underpayment of tax attributable to these valuation overstatements. *731 3. Section 6621(c) Section 6621(c), formerly section 6621(d), provides for an increased rate of interest "with respect to any substantial underpayment attributable to tax motivated transactions". A "substantial underpayment" is defined as an amount exceeding $ 1,000. Sec. 6621(c)(2). The definition of a "tax motivated transaction" encompasses any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Because of our holdings above, we find petitioner is liable for the increased interest of section 6621(c). The section, however, applies only to interest accruing after December 31, 1984. Sec. 301.6621-2T, Q-10 & A-10, Temporary Proc. & Admin. Regs., 49 Fed. Reg. 50390 (Dec. 26, 1984). To reflect the above holdings, Decision will be entered for respondent. APPENDIX I 1982 Program: Income Stream Valuation over 10 years (assume 5 units) Year
Income from
15%
Net
Loan
Principal
Unpaid
Principal
Rental
Mgmt.
Income
Payment
& Interest
Interest
Balance
Fee
Portions
Accrual
[1]Year 0 (1982): Initial Payment = $ 14,000 Year 1 (1983): Arizona Commercial Energy Credit = $ 8,400
1  [2]612 Base     92 520 520  0 / 520
380
10,000
Rent
2  [2]1316 Base    197 1119 1119  0 / 1119
161
10,000
Rent
3  [2]1513 Base    227 1286 1286  225 / 1061
0 9,775
Rent
4  [2]1740 Base    261 1479 1479  599 / 880
0 9,176
Rent
5  [2]2001 Base    300 1701 1701  875 / 826
0 8,301
Rent
6  1464 75% of   220 1244 1244  497 / 747
0 7,804
energy
savings
7  1584 75% of   238 1346 1346  644 / 702
0 7,160
energy
savings
8  1714 75% of   257 1457 1457  813 / 644
0 6,347
energy
savings
9  1854 75% of   278 1576 1576  1005 / 571
0 5,342
energy
savings
10 2006 75% of   301 1705 1705  1224 / 481
0 4,118
energy
savings
Court's Projections
Sums
$ 15,804
2,371
$ 13,433
$ 13,433
*732 $ 4,118 owed on loan at end of 10 years (NPV at 17% = $ 857) Net Present Value (at 17% Discount Rate) Since Net Income = Loan Payments -- NPV of Investment =
Unpaid Pr. =   (857)
Init. Pymt =   (14,000)
[1]Ariz. Cred. =   8,400 NPV   ($ 6,457)  1982 Investment: Information per unit Year
1
2
3
4
Cost of Energy
0.0584
0.0632
0.0684
0.074
Cost of Energy
Required per yr 438.39
474.42
513.45
555.49
(7506.66 kWh/yr) Cost of Energy
Saved 263.03
284.65
308.07
333.30
(4504 kWh/yr) 75% Energy Savings
197.27
213.49
231.05
249.97
*733 Year
5
6
7
8
9
10
Cost of Energy
0.0801
0.0867
0.0938
0.1015
0.1098
0.1188
Cost of Energy
Required per yr 601.28
650.83
704.12
761.93
824.23
891.79
(7506.66 kWh/yr) Cost of Energy
Saved 360.77
390.50
422.48
457.16
494.54
535.07
(4504 kWh/yr) 75% Energy Savings
270.58
292.87
316.86
342.87
370.90
401.30
APPENDIX II 1983 Program: Income Stream Valuation over 10 years (assume 5 units) Year
Income from
16%
Net
Loan
Principal
Unpaid
Principal
Rental
Mgmt.
Income
Payment
& Interest
Interest
Balance
Fee
Portions
Accrual
[1]Year 0 (1983): Initial Payment = $ 12,000 Year 1 (1984): Arizona Commercial Energy Credit = $ 7,200
1  [2]720 Base     115 605 605
0 / 605
475
12,000
Rent
2  [2]1440 Base    230 1210 1210
0 / 1210
346
12,000
Rent
3  [2]1656 Base    265 1391 1391
0 / 1391
35
12,000
Rent
4  [2]1908 Base    305 1603 1603
488 / 1115
0
11,512
Rent
5  [2]2194 Base    351 1843 1843
807 / 1036
0
10,705
Rent
6  1584 75% of
253 1331 1331
368 / 963
0
10,337
energy
savings
7  1714 75% of   274 1440 1440
510 / 930
0
9,827
energy
savings
8  1854 75% of   297 1557 1557
673 / 884
0
9,154
energy
savings
9  2006 75% of   321 1685 1685
861 / 824
0
8,293
energy
savings
10 2170 75% of   347 1823 1823
1077 / 746
0
7,216
Court's Projections
Sums
$ 17,246
$ 2,758
$ 14,488
$ 14,488 *734 $ 7,216 owed on loan at end of 10 years (NPV at 17% = $ 1,500) Net Present Value (at 17% Discount Rate) Since Net Income = Loan Payments -- NPV of Investment =
Unpaid Pr. =
(1,500)
Init. Pymt =
(12,000)
Ariz. Cred. [1]=
7,200 NPV
($ 6,300)
1983 Investment: Information per unit Year
1
2
3
4
Cost of Energy
0.0632
0.0684
0.074
0.0801
Cost of Energy
Required per yr 474.42
513.45
555.49
601.28
(7506.66 kWh/yr) Cost of Energy
Saved 284.65
308.07
333.30
360.77
(4504 kWh/yr) 75% Energy Savings
213.49
231.05
249.97
270.58
Year
5
6
7
8
9
10
Cost of Energy
0.0867
0.0938
0.1015
0.1098
0.1188
0.1285
Cost of Energy
Required per yr 650.83
704.12
761.93
824.23
891.79
964.60
(7506.66 kWh/yr) Cost of Energy
Saved 390.50
422.48
457.16
494.54
535.07
578.76
(4504 kWh/yr) 75% Energy Savings
292.87
316.86
342.87
370.90
401.30
434.07
*735 Footnotes
1. 50 percent of the interest due on $ 8,143, $ 7,497, and $ 6,804, for 1983, 1984, and 1985, respectively. ↩
2. 120 percent of the interest due on $ 8,143, $ 7,497, and $ 6,804, for 1983, 1984, and 1985, respectively.↩
1. At the time of all transactions with petitioner, BFS and BFS Solar had common officers and directors. Bertram Trobman was the president and a director, and Harriet Trobman was also an officer and a director of each corporation. At trial, although requested to do so, Trobman could not or did not distinguish among BFS, BFS Solar, and himself. We find that Trobman, BFS, and BFS Solar are essentially alter egos.↩
2. Since BFS Solar never purchased the 500 units, BFS Solar never became the exclusive dealer for Amcor. The parties' argument as to whether BFS Solar was an authorized dealer or the exclusive dealer is in any event irrelevant to the issues in this case.↩
3. There is no independent evidence in the record to support these figures. The Court's recitations of various statements from the Placement Memorandum for the 1982 program and from the Prospectus for the 1983 program are intended solely to show the representations made to investors. The Court does not accept these documents as proof of the truth of the statements contained therein.↩
4. As a noncorporate lessor, petitioner could not qualify for an investment tax credit for the 1982 units unless his sec. 162(a) business expenses exceeded↩ 15 percent of the rental income produced by such property. Sec. 46(e)(3)(B). Petitioner tries to tack on to the 15 percent management fee some $ 500 of the amount he paid to Villaneuva, his accountant. However, that payment was for advice (the nature of which is not disclosed by the record) Villaneuva gave him about the proposed investment before he decided to enter into the sale-leaseback program. That payment did not involve a business expense of any leasing activity. The year 1982 is not before the Court, but there may be some carryover of the 1982 investment tax credit to subsequent years.
5. Using a computer program called F-Chart, respondent's expert calculated a 60 percent solar fraction for the Solon 240 in a six-member Phoenix household. Nonetheless, the 5 percent difference may be attributable to the "Active System Package". The Arizona Solar Energy Commission's guide discusses the cost of operating any pumps. The Solon 120's Btu rating would not have been adjusted for the energy consumed in running a pump, because it had no "Active System Package".↩
6. On June 9, 1983, James F. Warnock, the Executive Director of the Arizona Solar Energy Commission wrote a letter to National Public Service to confirm that the Amcor 240 systems were generally eligible for Arizona Solar Tax Credits in 1983. The letter expressly did not address the question of whether a leased system was eligible for Federal or State tax credits, stating: This letter is provided merely for clarification of equipment certification. The State of Arizona and the Arizona Solar Energy Commission neither approve or disapprove of either the equipment mentioned above or the leasing program in question. * * *↩
7. In an amendment to the prospectus, effective November 15, 1983, BFS Solar modified the payment terms by reducing the initial cash investment in 1983 to $ 6,000 and by adding a $ 6,000 non-interest-bearing promissory note, due March 15, 1984. ↩
8. The $ 24 per month per unit figure was the base rent.↩
9. Neither Trobman's testimony nor the notes to his income analysis explain how he arrived at $ 2,100 as the total 1983 utility cost from the $ 35 per month figure supplied by APS for a family for four. The $ 2,100 first-year figure is $ 35 per month (the rate APS charged a family of four↩), multiplied by 5 (the minimum number of pieces of equipment per investor), multiplied again by twelve (the number of months in a year). His income analysis states that it is based on a family of four, but at trial Trobman blithely dismissed this as a typographical error. The Court did not believe him and concludes that it was indeed based on a family of four.
10. For a family of six the solar fraction would be 60 percent according to Schon. See supra↩ note 5.
11. Schon neglected to adjust the amount of the Arizona state tax credit, which is limited to $ 1,000 for an individual homeowner, thus differing from the commercial credit. With that correction, this figure would be $ 2,986.↩
*. Based on collecting 75.0 percent of homeowner's savings. + Assume note refinanced↩
*. Based on collecting 75.0 percent of homeowner's savings.↩
12. This should be compared with the 20 percent per year average rate increase (15 percent per year with a 54 percent increase in 1985) which Trobman forecast in his "Income Analysis and Internal Rate of Return". Trobman's 20 percent per year rate increase assumed dire economic circumstances over a 12-year period. Trobman's large percentage increase per year over such a protracted period of time was an unreasonable assumption.↩
13. Petitioner ultimately paid a total of $ 20,000 in cash for 10 units under the 1982 program. He paid total cash of $ 12,000 for five units under the 1983 program. However, these analyses are not directed at petitioner specifically, but at any reasonable person investing in the two programs. Also, although the minimum number of units was three under the 1982 program and five under the 1983 program, the analyses are for five each year for comparative purposes.↩
14. We need not, and do not, decide whether such State tax credits serve to imbue a transaction with economic substance for Federal tax purposes. Here, even with the benefit of the State tax credit, the net present value of the investment is a negative figure.↩
15. BFS Solar did purchase from Amcor and pay for at least 310 Solon 240 units, and these units were actually installed on the roofs of homeowners, so this was not a sham for example in the sense of a transaction involving nonexistent cattle. We think that it was a sham in that the papers drawn up did not represent the true economic substance of the transactions. We think that the transactions could be viewed as joint ventures, or a financing arrangement, with the investors providing the seed money and Trobman and his companies providing the extensive services required to try to launch a solar water heater leasing business in the Phoenix area. If the case had been presented in those terms, the Court would have allocated some portion of the investors' cash payments to the units and the rest to the extensive services and expenses involved in any such leasing activity. However, petitioner presented the case on an all-or-nothing basis.↩
1. 5 X ($ 1,400 cash + $ 1,400 short-term note, which we treat as cash, per unit). ↩
2. For 1983 through 1987, we have used BFS Solar's schedule of base rents as the rental income. Thereafter, we have used as the rental income 75 percent of the energy savings each year.↩
1. 35 percent for units installed in 1983↩
1. $ 2,400 cash per unit ↩
2. BFS Solar's schedule of base rents used for years 1984 through 1988 and 75 percent of energy savings each year thereafter↩
1. 30 percent for units installed in 1984↩